188 F.3d 130 (3rd Cir. 1999)
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS of AMERICA, U.A.W.; U.A.W. LOCAL NO. 1697; THEODORE RUEF, for Himself and all Others Similarly Situated, Appellants,
v.
SKINNER ENGINE COMPANY, Appellee.
 No. 98-3461
 UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
 Argued: May 24, 1999
Decided: August 10, 1999
 
 1
 On Appeal from the United States District Court for the Western District of Pennsylvania (Dist. Ct. Civil Action No. 93-289E) District Judge: Maurice B. Cohill, Jr. [Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 Richard E. Gordon, Esq. (Argued), Howard Grossinger, Esq., GROSSINGER, GORDON & VATZ, 1000 Law & Finance Building, Pittsburgh, PA 15219
 
 
 3
 William D. Taggart, Esq., 1359 West 6th Street, Frontier Place, Erie, PA 16505, Attorneys for Appellants
 
 
 4
 James T. Marnen, Esq. (Argued), KNOX McLAUGHLIN GORNALL, & SENNETT, P.C., 120 West Tenth Street, Erie, PA 16501-1461, Attorney for Appellee
 
 
 5
 BEFORE: GREENBERG and ALITO, Circuit Judges, and ACKERMAN, Senior District Judge*
 
 OPINION OF THE COURT
 ACKERMAN, Senior District Judge:
 
 6
 The primary question presented in this appeal is whether life and medical insurance benefits provided to retired employees under various collective bargaining agreements vested at the time of each employee's retirement or were terminable by the employer at the expiration of the collective bargaining agreement under which the right to the benefits was provided. Appellants, representatives of a class of former, now retired, hourly employees of defendant Skinner Engine Company ("Skinner"), contend that the plain language of the collective bargaining agreements provided for lifetime benefits. They argue alternatively that the agreements were sufficiently ambiguous on the issue of vesting, and therefore, the matter can be resolved only after a full trial on the merits. The district court disagreed on both counts and granted Skinner's motion for summary judgment dismissing the action. See International Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W., U.A.W. Local No. 1697 v. Skinner Engine Co. , 15 F. Supp. 773 (W.D. Pa. 1998).
 
 
 7
 This court has jurisdiction over the present appeal pursuant to 28 U.S.C. S 1291. We affirm.
 
 I. BACKGROUND
 
 8
 The plaintiffs/appellants in this matter are International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W. ("International Union"), U.A.W. Local No. 1697 ("Local 1697"), and class representative Theodore Ruef. Ruef is a retired hourly employee of Skinner who brought this action on behalf of himself and all other retired hourly workers of Skinner, as well as their spouses, who retired before September 3, 1993. International Union and Local 1697 are the exclusive collective bargaining agents for the hourly production and maintenance workers employed by Skinner, which is located in Erie, Pennsylvania.[1]
 
 
 9
 In 1970, the hourly employees at Skinner unionized, and their relationship thereafter was embodied in a sequence of collective bargaining agreements (the "CBAs") covering the time periods from 1974 to 1977, 1977 to 1980, 1980 to 1981, 1981 to 1984, 1986 to 1989, 1989 to 1993, and 1993 to 1996.[2] From 1974 until the 1993 CBA went into effect, Skinner paid all of its hourly retirees' health care benefits, fifty percent of health care premiums for retirees' spouses until they attained the age of sixty-five, and the retirees' premiums on life insurance. These benefits were even paid by Skinner between 1984 and 1986, when the employees worked without a contract.
 
 
 10
 At issue in this case is a provision in the CBAs relating to life and medical insurance benefits entitled, "INSURANCE AND PENSION." The wording of the section, however, is not the same in all the CBAs, and the appellants have focused on the sometimes subtle differences. With respect to medical insurance benefits, S 47.2 of the 1971-1974 CBA, entitled, "Blue Cross-Blue Shield Coverage," provided in relevant part as follows:
 
 
 11
 The Company will continue to provide Blue Cross-Blue Shield hospitalization and surgical coverage, all costs being borne by the Company. (Emphasis supplied).
 
 
 12
 All of the CBAs contained substantially similar language with respect to Blue Cross-Blue Shield coverage.
 
 
 13
 The CBAs also provided "Major Medical Insurance Coverage." The 1974-1977 CBA, for example, stated as follows:
 
 
 14
 The Company will continue to provide major medical insurance coverage, all costs being borne by the Company. Employees over 65 must enroll in Medicare A&B and B/C, B/S/Supplementals. (Emphasis supplied).
 
 
 15
 The 1977-1980, 1981-1984, 1986-1989, and 1989-1993 CBAs contain substantially similar language.
 
 
 16
 Beginning with the 1977-1980 CBA, Skinner provided a prescription drug insurance policy. Section 45.2 of the 1980-1981 CBA, for example, stated that Skinner "will continue to provide . . . prescription drug insurance policy with deductible . . . all costs being borne by the Company." (Emphasis supplied). The 1984-1986, 1986-1989, and 1989-1993 CBAs contained substantially similar language.[3]
 
 
 17
 With respect to life insurance coverage, the appellants rely on language found in some of the CBAs that such coverage "shall remain" at a certain figure. Section 44.5 of the 1981-1984 CBA, for example, provided in relevant part that "Life Insurance Coverage for retirees shall remain at $3,000 during the term of this Agreement." (Emphasis supplied). The 1986-1989 and 1989-1993 CBAs contained identical language, except with respect to the specific amount of coverage.
 
 
 18
 Each of the CBAs also contained as the last section of the agreement a provision entitled, "Term of Agreement." Section 51 of the 1974-1977, for example, states as follows: "This Agreement shall be effective as of September 1, 1974, and continue in full force and effect through August 31, 1977, at which time it will terminate." Similarly, S 46 of the 1986-1989 CBA provides in relevant part as follows:
 
 
 19
 This Agreement represents a complete resolution of all non economic items and shall, in all of its terms, remain in effect from July 1, 1986 until midnight, June 30, 1989. With respect to economic items, the agreement shall be reopened and these items shall be subject to negotiations prior to July 1, 1987. . . .
 
 
 20
 In December, 1991, the Financial Accounting Standards Board ("FASB")[4] issued a new statement, FASB Statement No. 106, which required that the projected future cost of providing post-retirement benefits be recognized by companies as an expense as employees render services, instead of recognizing the expense when those benefits were paid.[5] Skinner implemented FASB Statement No. 106 as of July 1, 1995. Because of the new accounting standard, Skinner believed that it was financially beneficial to reduce the benefits it provided to active employees and retirees.
 
 
 21
 At the time FASB Statement No. 106 was issued, the 1989 CBA was in effect. The 1989 CBA was scheduled to expire on June 30, 1993. During the 1993 negotiations, the union took the position that the proposed changes concerning retiree benefits applied only to future retirees. However, after the terms of the 1993 CBA were agreed upon, including the terms of medical and life insurance benefits for retirees, Skinner eliminated or modified those benefits for retirees retroactively. Consequently, employees who had retired prior to the effective date of the 1993 CBA were no longer eligible for the benefits to which they had become accustomed. Specifically, the changes involved the following: (1) elimination of life insurance for the retirees; (2) elimination of Skinner's payment of one-half of the cost of health insurance for the retirees' spouses; (3) requiring a co-payment of premiums by retirees with respect to Medicare supplemental health insurance coverage; (4) requiring a co-payment of premiums from retirees with regard to prescription drug insurance; and (5) an increase of the deductibles with respect to retirees' life insurance and spousal health insurance, allowing coverage to continue with payment of the premiums by the retiree or spouse.
 
 
 22
 This suit followed. Appellants contend that Skinner's termination of benefits constitutes a breach of the CBAs under Section 301 of the Labor Management Relations Act, 29 U.S.C. S 185, and a breach of its fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. S 1001 et seq. They further assert that Skinner is equitably estopped from denying lifetime benefits.
 
 II. DISCUSSION
 A. The Summary Judgment Standard
 
 23
 On appeal, this court exercises plenary review of the district court's granting of summary judgment. See Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). Accordingly, "the appellate court is required to apply the same test the district court should have utilized." Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987) (in banc); see also Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir. 1995).
 
 
 24
 Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted
 
 
 25
 if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.
 
 
 26
 In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Indiana Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences are construed in the light most favorable to the non-moving party. See Peters v. Delaware River Port Auth. of Pa. and N.J., 16 F.3d 1346, 1349 (3d Cir. 1994).
 
 
 27
 At the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the factfinder. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1330 (3d Cir. 1993). Therefore, to raise a genuine issue of material fact, " `the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the `mere scintilla' standard." Id.; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").
 
 
 28
 It is clear, however, that if a moving party satisfies its initial burden of proving a prima facie case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, "[t]here must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).
 
 
 29
 B. Contract Interpretation and Lifetime Benefits
 
 
 30
 ERISA recognizes two types of employee benefit plans: pension plans and welfare plans. See In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896, 901 (3d Cir. 1995) ("Unisys II"); Deibler v. Local Union 23, 973 F.2d 206, 209 (3d Cir. 1992). Employee welfare plans provide "medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . ." 29 U.S.C. S 1002(1). Pension plans, on the other hand, provide (i) retirement income to employees, or (ii) result in a deferral of income by employees for periods extending to the termination of covered employment or beyond. 29 U.S.C. S 1002(2)(A). Although ERISA contains elaborate vesting requirements for pension plans, it does not require automatic vesting of welfare benefit plans. See Unisys II, 58 F.3d at 901; Smith v. Hartford Ins. Group, 6 F.3d 131, 136 (3d Cir. 1994); Alexander v. Primerica Holdings, Inc., 967 F.2d 90, 95 (3d Cir. 1992).
 
 
 31
 This was not merely an oversight on the part of Congress. See Wise, 986 F.2d at 935 ("The disparate treatment accorded welfare plans is not accidental. . . ."). Vesting requirements were not established for employee welfare plans because Congress determined that "[t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1160 (3d Cir. 1990). In rejecting the automatic vesting of welfare plans, Congress recognized the need for flexibility with respect to an employer's right to change medical plans. As the Court of Appeals for the Second Circuit has observed:
 
 
 32
 Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation. These unstable variables prevent accurate prediction of future needs and costs.
 
 
 33
 Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988); see also 29 U.S.C. S 1051.
 
 
 34
 Although construction of collective bargaining agreements is generally governed by federal law, traditional rules of contract construction apply when not inconsistent with federal labor law. See Transportation-Communication Employees Union v. Union Pacific R.R., 385 U.S. 157, 160- 61 (1966); Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 456-57 (1957); Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993). The interpretation of a collective bargaining agreement or other plan document is typically a question of law. See Sheet Metal Workers Local 19 v. Keystone Heating and Air Conditioning, 934 F.2d 35, 41 (3d Cir. 1991); United Paperworkers Int'l Union v. Champion Int'l Corp., 908 F.2d 1252, 1256 (5th Cir. 1990); Local Union No. 150-A, United Food and Commercial Workers Int'l Union v. Dubuque Packing Co., 756 F.2d 66, 69 (8th Cir. 1985). Where the contract is clear and unambiguous, a court must determine its meaning as a matter of law. See W.B. v. Matula, 67 F.3d 484, 497 (3d Cir. 1995); Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 564-65 (7th Cir. 1995).
 
 
 35
 Employers are "generally free . . . for any reason at any time, to adopt, modify or terminate welfare plans." Curtiss- Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995). They may agree of course to relinquish their right to unilaterally terminate those benefits and provide for lifetime vesting. See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co., 520 U.S. 510, 515 (1997) (noting that employer may "contractually cede[ ] its freedom" not to vest benefits); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 555 (1964) (finding that parties to collective bargaining agreement may provide for rights that survive beyond expiration of agreement); Unisys II, 58 F.3d at 902; Howe v. Varity Corp., 896 F.2d 1107 (8th Cir. 1990); DeGeare v. Alpha Portland Indus., Inc., 837 F.2d 812, 815 (8th Cir. 1988), vacated on other grounds, 489 U.S. 1049 (1989). This court has made clear that the "plan participant bears the burden of proving, by a preponderance of the evidence, that the employer intended the welfare benefits to be vested." Unisys II, 58 F.3d at 902.
 
 
 36
 In applying these standards, it must be remembered that to vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language. See Unisys II, 58 F.3d at 902; see also Spacek v. Maritime Ass'n, ILA Pension Plan, 134 F.3d 283, 293 (5th Cir. 1998); Sprague v. General Motors Corp., 133 F.3d 388, 400 (6th Cir.) (stating that commitment to vest "is not to be inferred lightly" and that it must be found in express language from plan documents), cert. denied, 118 S.Ct. 2312 (1998); John Morrell & Co. v. United Food and Commercial Workers Int'l Union, AFL-CIO, 37 F.3d 1302, 1304 (8th Cir. 1994) ("[C]ourts are reluctant to read more benefits into an ERISA plan than its plain language confers."); Gable v. Sweetheart Cup Co., 35 F.3d 851, 855 (4th Cir. 1994) (noting that because employer's promise of lifetime benefits constitutes an "extra-ERISA commitment, courts may not "lightly infer the existence of an agreement to vest employee welfare benefits"); Sengpiel v. B.F. Goodrich Co., 970 F. Supp. 1322, 1337 (N.D. Ohio 1997) ("Courts may not casually infer the existence of vesting; doing so would undercut Congress' considered decision that, while pension benefits are strictly regulated and guaranteed, welfare benefits have no such protection."), aff'd , 156 F.3d 660 (6th Cir. 1998), cert. denied, 119 S.Ct. 1249 (1999); see also Adams v. Avondale Indus., Inc., 905 F.2d 943, 947 (6th Cir. 1990) (cautioning that in determining scope and extent of employer's obligations under welfare benefit plans, courts avoid undermining Congress' "considered decision that welfare benefit plans not be subject to a vesting requirement"). These cautionary principles apply without regard as to whether the employee welfare benefits are provided under a collective bargaining agreement, SPD, or other plan document; the same underlying considerations are present irrespective of the particular type of document at issue.
 
 
 37
 The appellants contend that their medical and life insurance benefits were lifetime benefits under the applicable CBAs, which precluded Skinner from unilaterally terminating those benefits in 1993. The appellants present two interrelated arguments on this point. Their overarching contention is that specific language in various CBAs established lifetime medical and life insurance benefits for retirees. In support of their interpretation of the contract language, the appellants urge this court to follow the Sixth Circuit's decision in International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1984). As discussed below, we reject both the appellants' invitation to adopt the presumption enunciated in Yard-Man and their interpretation of the relevant contract language.
 
 
 38
 Yard-Man, as this case, arose from the termination of life and health insurance benefits of retired employees at the expiration of a collective bargaining agreement. The specific provision at issue provided as follows:
 
 
 39
 When the former employee has attained the age of 65 years then:
 
 
 40
 (1) The Company will provide insurance benefits equal to the active group benefits . . . for the former employee and his spouse.
 
 
 41
 Id. at 1480 (emphasis supplied). The court found that the italicized phrase was ambiguous, lending itself to two alternative interpretations. Looking to other provisions of the collective bargaining agreement for evidence of intent, the Sixth Circuit concluded that retiree benefits were indeed vested and continued beyond the life of the collective bargaining agreement. Id. at 1480-81.
 
 
 42
 While ostensibly relying on the terms and structure of the collective bargaining agreement, it is evident that the Sixth Circuit emphasized two factors weighing in favor of an interpretation that retiree benefits survived the expiration of the agreement. First, the court noted that retiree benefits are ordinarily vested because they
 
 
 43
 are only permissive not mandatory subjects of collective bargaining. . . . As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations. . . . The employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees. If they forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements.
 
 
 44
 Id. at 1482, 1482 n.8 (citations omitted); see also International Union, United Auto., Aerospace and Agric. Implement Workers of Am., Local 784 v. Cadillac Malleable Iron Co., 728 F.2d 807, 809 (6th Cir. 1984). Second, the court viewed retiree benefits as "status" benefits which carried with them an inference that they continue so long as the prerequisite status is maintained. Id. at 1482.
 
 
 45
 The Sixth Circuit, therefore, adopted what has become commonly known as the "Yard-Man inference," pursuant to which courts presume that the parties intended retiree welfare benefits to continue for life, notwithstanding the expiration of a collective bargaining agreement. The inference exerts a fair amount of influence in how these types of cases are resolved. In Yard-Man, the presumption was such that the court rejected the company's contention that the general durational clause, which provided for the termination of the collective bargaining agreement on a date certain, precluded any inference that retirement insurance benefits were vested. The court determined that when there is sufficient indicia of lifetime benefits, a general durational clause is insufficient to defeat vesting. Id. at 1482-83.
 
 
 46
 The Yard-Man inference continues to represent the state of the law in the Sixth Circuit. See, e.g., Golden v. Kelsey- Hayes Co., 73 F.3d 648, 656 (6th Cir. 1996). It appears that the First, Fourth, and Eleventh Circuits also apply the Yard-Man inference. See, e.g., United Steelworkers of Am., AFL-CIO v. Textron, Inc., 836 F.2d 6, 9 (1st Cir. 1987) (relying specifically on Yard-Man in finding benefits were vested); Keffer v. H.K. Porter Co., 872 F.2d 60, 64 (4th Cir. 1989) (recognizing that Yard-Man provided "a more far-reaching understanding of the context in which retiree benefits arise: [they] are typically understood as a form of delayed compensation or reward for past services[which would not] be left to the contingencies of future negotiations"); United Steelworkers of Am. v. Connors Steel Co., 855 F.2d 1499, 1505 (11th Cir. 1988) ("We fully concur with the decisions of the Court of Appeals for the Sixth Circuit in [Yard-Man]."). The Fifth and Eighth Circuit, however, have specifically declined to follow Yard-Man. See, e.g., International Ass'n of Machinists v. Masonite Corp., 122 F.3d 228, 232 (5th Cir. 1997); Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1517 (8th Cir. 1988); Champion Int'l, 908 F.2d at 1261 n.12.
 
 
 47
 We cannot agree with Yard-Man and its progeny that there exists a presumption of lifetime benefits in the context of employee welfare benefits. With respect to the Sixth Circuit's view that retiree benefits are "status" benefits which carried with them an inference that they continue so long as the prerequisite status is maintained, we agree with the reasoning of the Eighth Circuit, which specifically rejected the notion:
 
 
 48
 [W]e disagree with Yard-Man to the extent that it recognizes an inference of an intent to vest. Congress explicitly exempted welfare benefits from ERISA's vesting requirements. It, therefore, seems illogical to infer an intent to vest welfare benefits in every situation where an employee is eligible to receive them on the day he retires. The court in Yard-Man recognized that no federal labor policy presumptively favors vesting. Because Congress has taken a neutral position on this issue "traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." Yard-Man, 716 F.2d at 1479. We believe that it is not at all inconsistent with labor policy to require plaintiffs to prove their case without the aid of gratuitous inferences.
 
 
 49
 Anderson, 836 F.2d at 1517. We echo these concerns and add that the Yard-Man inference may be contrary to Congress' intent in choosing specifically not to provide for the vesting of employee welfare benefits.
 
 
 50
 Nor is the contention that retiree benefits are permissive, rather than mandatory, aspects of collective bargaining a particularly appropriate reason for applying a presumption in favor of vesting. In Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th Cir. 1993) (in banc), the retirees argued, as here, that because their benefits were merely a permissive aspect of collective bargaining, the union owed no obligation to bargain for continued benefits for retirees. Thus, they argued that it was unlikely that retiree benefits would be left to the contingencies of future negotiations. Judge Posner, writing for a plurality of the court, answered this concern:
 
 
 51
 The counterargument is that, knowing this, current employees who may retire in the next three years want their collective bargaining agreement to vest health benefits. . . . Most, perhaps all, the class members were active employees when a collective bargaining agreement containing the provision for retirees' health benefits was signed.
 
 
 52
 Id. at 609. Accordingly, those who fear that their unions will not bargain for continued benefits for retirees need only see to it that specific vesting language protecting those benefits is incorporated into collective bargaining agreements.
 
 
 53
 We will therefore interpret the relevant provisions of the CBAs without the benefit of the inference established by Yard-Man. The remainder of the appellants' argument is quite straightforward, albeit ultimately unavailing. They argue that the phrases, "will continue" and "shall remain," in the CBAs unambiguously evince an intent on the part of the union and Skinner to vest medical and life insurance benefits for retirees. A plain reading of the phrases, "will continue" and "shall remain," certainly does not unambiguously indicate that the benefits will continue ad infinitum, as argued by the appellants. It cannot be said that the phrases clearly and expressly indicate vesting since there is simply no durational language to qualify these phrases. That is, the CBAs do not state that retiree benefits "will continue for the life of the retiree," or that they "shall remain unalterable for the life of the retiree." An equally reasonable interpretation is that the benefits "will continue until the CBA expires," or that they "shall remain . . . until the CBA expires." Indeed, the latter interpretation appears to be the more reasonable in light of the durational provisions in all of the CBAs. Section 46 of the 1986-1989 CBA is illustrative: "This Agreement represents a complete resolution of all non economic items and shall, in all of its terms, remain in effect from July 1, 1986 until midnight, June 30, 1989. . . ." Read in conjunction with the durational clauses, the phrases could be interpreted to mean, for instance, that the medical benefits "will continue until midnight of June 30, 1989."
 
 
 54
 The Second Circuit, in Joyce v. Curtiss-Wright Corp., 171 F.3d 130 (2d Cir. 1999), rejected a textual argument similar to that presented by the appellants herein. In that case, retirees brought an action against their former employer which had unilaterally terminated health insurance benefits. Specifically at issue was the following language in a group insurance agreement, which had been incorporated by reference into the collective bargaining agreement:
 
 
 55
 Effective November 4, 1968, this insurance . . . will be provided for employees receiving or becoming entitled to receive pension payments. . . . (Emphasis supplied).
 
 
 56
 The Second Circuit held that the italicized language did not indicate an intent on the part of the employer to vest retiree benefits. Contentions by the retirees to the contrary, the court noted, constituted "extensive linguistic contortion" in an attempt to "manufacture" ambiguity where it did not exist. Id. at 134. In a plain statement on the matter, the Second Circuit stated that it "will not infer a binding obligation to vest benefits absent some language that itself reasonably supports that interpretation." Id. at 135.
 
 
 57
 We similarly reject the appellants' contention here that the language of the CBAs unambiguously vested lifetime medical and life insurance benefits for retirees.
 
 
 58
 In the alternative, the appellants contend that the phrases, "will continue" and "shall remain," are ambiguous, thereby precluding summary judgment in favor of Skinner. Whether a collective bargaining agreement or other plan document is clear or ambiguous is a question of law, subject to plenary review. See Rolls-Royce, 989 F.2d at 135, 135 n.2; Alexander, 967 F.2d at 92; see also Matula, 67 F.3d at 497 ("The initial determination of whether terms are ambiguous is itself a question of law."). A contract clause is ambiguous when it is "subject to reasonable alternative interpretations." Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir. 1991); see also Curcio v. John Hancock Life Ins. Co., 33 F.3d 226, 231 (3d Cir. 1994) (noting that if court finds "but one reasonable interpretation, then a fortiori there can be no ambiguity"). To determine whether a contract is ambiguous, acourt may not merely consider whether the language is clear from its point of view. See Rolls-Royce, 989 F.2d at 135. Rather, a court must " `hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.' " Id. (quoting Sheet Metal Workers, Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1284 (3d Cir. 1991)). Reference must be made to the "contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." Id.
 
 
 59
 Appellants suggest that the phrases, "will continue" and "shall remain," could be interpreted to mean that Skinner would pay for such benefits for the life of a retiree. We do not believe this to be a reasonable interpretation of those phrases. Rather, read in their appropriate contexts, those phrases clearly did not evince Skinner's intent to carry with them the obligation to provide benefits for life. See Alexander, 967 F.2d at 93 (noting that contracts must be "construed as a whole . . . and context colors the meaning of words"). The premise of the appellants' position in this regard appears to be that the phrases, "will continue" and "shall remain," have prospective meaning only. However, the structure of the contract reveals that just the opposite was intended, that the terms were used to refer back to previous CBAs.
 
 
 60
 With respect to life insurance benefits, for example, the language used by the CBAs varied depending upon whether the amount of coverage was equal to or greater than that afforded under the previous CBA. When the amount of coverage was increased from the prior CBA, the agreements utilized the phrase, "shall be increased." Section 47.5 of the 1974-1977 CBA, for example, stated that "[c]overage for retirees shall be increased . . . from $1,000.00 to $1,500.00. . . ." See also 1977-1980 CBA at S 45.5;1980- 1981 CBA at S 45.5; 1989-1993 CBA at S 44.6. When the amount of coverage was not changed, however, the agreements used the phrase, "shall remain." The 1980- 1981 CBA established the amount of life insurance coverage at $3,000. In the next CBA, 1981-1984, the parties agreed not to increase the amount of coverage: "Life Insurance Coverage for retirees shall remain at $3,000 during the term of this Agreement." Life insurance coverage was also not increased under the 1986-1989 CBA: "Coverage for retirees shall remain at $3,000 during the term of this Agreement."
 
 
 61
 With respect to medical insurance benefits, the language used appears to have varied depending upon the type of coverage provided. When a new type of coverage was provided under a particular CBA, the parties used language such as "will be obtained," "will be instituted," and "will provide." When the coverage was of the same kind as that furnished under a prior CBA, the language used was "will continue to provide." For example, the 1971-1974 CBA provided that major medical insurance coverage " will be instituted at Company expense--$25,000 maximum; $100 deductible; 80/20 co-insurance; dependents up to age 25 in school. . . ." In the following 1974-1977 and 1977-1980 CBAs, when the coverage did not change, the agreements simply provided that the "Company will continue to provide major medical insurance, all costs being borne by the Company."
 
 
 62
 Catastrophic major medical insurance was a new type of coverage provided by the company beginning with the 1980-1981 CBA, which stated that the "Company will provide catastrophic major medical coverage, all costs being borne by the Company, effective October 1, 1980." Subsequent agreements, in which the catastrophic major medical coverage was not changed, provided that the "Company will continue to provide catastrophic major medical coverage, all costs being borne by the Company."
 
 
 63
 This use of the phrase, "will continue," is also consistent with respect to prescription drug insurance, which the company first provided in the 1977-1980 CBA:
 
 
 64
 The Company will continue to provide the Blue Cross- Blue Shield hospitalization and surgical existing insurance, all costs being borne by the Company. A prescription drug insurance policy with deductible will be obtained to be effective 3/1/78. (Emphasis supplied).
 
 
 65
 In subsequent CBAs, when prescription drug coverage was unchanged, the agreements provided as follows:
 
 
 66
 The Company will continue to provide the Blue Cross- Blue Shield hospitalization, prescription drug insurance policy with deductible and existing surgical insurance, all costs being borne by the Company. (Emphasis supplied).
 
 
 67
 Accordingly, when read in proper context, there appears no textual support for the appellants' contention that the use of the phrases, "shall remain" and "will continue," manifested an intent on the part of contracting parties to vest life and medical insurance benefits for retirees. Rather than indicating a promise on the part of the company to provide such coverage prospectively for the life of the retiree, the phrases were used to indicate a continuation of prior practice and policies. Appellants' contentions here have legitimacy only if this court were to view the phrases in a vacuum, without considering the appropriate contexts in which they were used. See, e.g., Senn v. United Dominion Indus., Inc., 951 F.2d 806, 816 (7th Cir. 1992) ("Thus, it requires more than a statement in a CBA that welfare benefits `will continue' to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits `will continue' for the duration of the contract."); DeGeare, 837 F.2d at 814, 816-17 (holding that employer's promise to future retirees that benefits "will continue" could not be read as promise of vested lifetime benefits).
 
 
 68
 The above conclusion is supported by the fact that the company's representation that it "will continue" to provide medical insurance benefits appears to have applied to both active employees and retirees. Clearly, the medical insurance benefits did not vest for active retirees, and there has been no argument to the contrary. Yet, the CBA provisions make no material distinction between active employees and retirees in this regard. The only reasonable conclusion--if one begins with the uncontroversial premise that benefits for active employees were not vested--is that benefits for retirees were likewise not vested.
 
 
 69
 The appellants' contention that the CBAs provided for lifetime insurance benefits is also undercut by the fact that the agreements, beginning with the 1974-1977 CBA, specifically utilized the term, "vesting," or equivalent language when it came to pension benefits. For example, S 45.6(c) of the 1980-1981 CBA stated: "The present pension plan provides for vesting of benefits with credit given for continuous service prior to August 1, 1968. . . ." Similarly, S 44.7(c) of the 1989-1993 CBA provided that "[e]ffective January 1, 1989, employees have a non- forfeitable right to 100% of their accrued benefits derived from Company pension contributions . . . ." Again, all of the CBAs, with the exception of the 1971-1974 CBA, specifically provided for pension "vesting" or that pension rights were "non-forfeitable." See John Morrell & Co., 37 F.3d at 1304 (holding that retiree health benefits were not vested based in part on fact that pension portion of agreement specifically used term, "vesting," while section concerning health benefits did not); Bidlack, 993 F.2d at 608 (noting that use of term, "vesting," in other parts of collective bargaining agreement strengthened inference that insurance coverage for retirees lasted only for duration of agreement).
 
 
 70
 The appellants also make much of the fact that between 1984 and 1986, when no collective bargaining agreement was in force, the company continued to provide retiree benefits. While there is support for the proposition that one may infer from this fact that retiree benefits are indeed vested, see Weimer v. Kurz-Kasch, Inc., 773 F.2d 669, 676 n.6 (6th Cir. 1985); Bower v. Bunker Hill Co., 725 F.2d 1221, 1225 (9th Cir. 1984), this inference is undermined when the employer also provides benefits to active employees. In Anderson, for instance, the Eighth Circuit found that although the company had continued to pay retiree welfare benefits during three strikes, it had also provided benefits to its active employees. 836 F.2d at 1518 n.3. The court concluded that the "fact that[the company] treated retirees and striking employees equally negates any inference of intent to vest retiree benefits." Id. The Second Circuit arrived at the same conclusion in American Federation of Grain Millers, AFL-CIO v. International Multifoods Corp., 116 F.3d 976, 981-82 (2d Cir. 1997).
 
 
 71
 In the case at bar, there is no dispute that Skinner paid benefits for both its retirees and active employees between 1984 and 1986 when no collective bargaining agreement was in force. Under Anderson and Multifoods, this concession dooms the appellants' contention on this point, and properly so. Benefits for active employees are generally not vested. If an employer nevertheless provides those benefits when no collective bargaining agreement is in force, it cannot be said that similar conduct with respect to retirees manifests its intent to undertake that obligation for their lifetimes. Put simply, if benefits for active employees do not become vested by this corporate largesse, and they do not, then retiree benefits cannot become vested through precisely the same conduct.
 
 
 72
 The appellants have expended considerable efforts to persuade this court that the testimonies of various members of the union and a former executive of Skinner create, at the very least, an ambiguity precluding summary judgment. We disagree.
 
 
 73
 The deposition testimonies of various union officials and members reveal that Skinner had historically paid retiree insurance benefits without interruption until September, 1993, despite the fact that such benefits were not always expressly set forth in the CBAs. Lawrence Milkowski, for instance, a union officer who participated in CBA negotiations from 1972 through 1992, stated in reference to retiree health and life insurance benefits, "it was never an issue." Current local union president Michael McInchak explained that "[h]istorically, in the shop, the benefit has always been carried with the man when he retires, to the end of his life. They had no reason to believe it would be different with them than with what it had been for previous retirees." Joseph Orlando, the UAW representative, began his union duties at Skinner in September, 1986. He participated in negotiating the 1987 economic reopener and 1989 CBA. Orlando testified in his deposition that the union's wariness of Skinner's new management led to discussions of memorializing retiree health benefits in the CBAs. He further testified that based on his discussions with the local union president, he came to believe that retiree benefits were vested.
 
 
 74
 The appellants also point to the deposition testimony of Robert Sok, a former chief operating officer at Skinner, in which he testified as follows:
 
 
 75
 Q. Do you have an opinion today or have you ever had an opinion as to whether those collective bargaining agreements provided a vested right in those retirement benefits--in health insurance and life insurance benefits to retirees?
 
 
 76
 A. Yes.
 
 
 77
 Q. You have had one?
 
 
 78
 A. Do I believe that they do?
 
 
 79
 Q. Yeah.
 
 
 80
 A. Yes.
 
 
 81
 Q. You do believe they do?
 
 
 82
 A. Yes.
 
 
 83
 Q. Upon what do you base that belief? The actual language of the agreements?
 
 
 84
 A. No, actual past practices and conditions of negotiations that says, "This is what we're going to do, we provide our retirees with those benefits."
 
 
 85
 The appellants contend that the testimonies of the union members and Sok create a genuine issue of material fact precluding summary judgment. They place particular emphasis on Sok's testimony, arguing that in attempting to determine contractual intent, statements by management personnel, particularly those in relatively high executive positions, as to what they believed the collective bargaining agreements required of them are extremely probative.
 
 
 86
 We do not find that this extrinsic evidence creates an ambiguity precluding summary judgment. To be sure, this court has instructed that extrinsic evidence may be used to determine whether a contract is ambiguous. See Rolls- Royce, 989 F.2d at 135, 135 n.2; Alexander , 967 F.2d at 92. Extrinsic evidence, however, may not be used to create an ambiguity where none exists. As the Seventh Circuit has explained:
 
 
 87
 [A]lthough extrinsic evidence can be used to show that a contract is ambiguous . . . extrinsic evidence cannot be used to create an ambiguity. . . . There is no contradiction here. The party claiming that a contract is ambiguous must first convince the judge that this is the case . . . and must produce objective facts, not subjective and self-serving testimony, to show that a contract which looks clear on its face is actually ambiguous. . . . Just as the court must determine whether a contract is ambiguous, so too the court must determine whether the extrinsic evidence offered in a given case interprets or contradicts the contract.
 
 
 88
 Murphy, 61 F.3d at 565 (citations omitted). This court has similarly made clear that the "written terms of the plan documents control and cannot be modified or superseded by the employer's oral undertakings." Unisys II, 58 F.3d at 902.
 
 
 89
 There are, therefore, limits on the use of extrinsic evidence in interpreting collective bargaining agreements. As Judge Posner's lead opinion in Bidlack recognized, permitting the use of extrinsic evidence in interpreting otherwise unambiguous or complete contracts creates the danger of depriving parties of the benefits of their written agreements:
 
 
 90
 The second extreme, that of allowing parties to substitute oral testimony for contractual language, errs by depriving parties of the protection of a written contract. . . . Since there is no similar structural necessity for a collective bargaining agreement to include an undertaking by the employer to pay lifetime medical benefits to retired employees, the use of extrinsic evidence to create such obligations nowhere alluded to in the contract would unjustifiably deprive the parties of the limitation of liabilities that is implicit in the negotiation of a written contract having a definite expiration date.
 
 
 91
 993 F.2d at 607-08. Accordingly, the use of extrinsic evidence should be carefully circumscribed:
 
 
 92
 Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, . . . there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.
 
 
 93
 Id. at 608; see also Joyce, 171 F.3d at 135 (noting that "at root the text itself must create a disputed question of fact as to vesting").
 
 
 94
 In the case at bar, there is no "contractual language on which to hang the label of ambiguous," and there is no "yawning void" crying out for an implied term. The phrases, "will continue" and "shall remain," as discussed above, are simply not susceptible to more than one reasonable interpretation, and they do not somehow render the CBAs incomplete or ambiguous.
 
 
 95
 In Unisys II, the retirees testified that they believed their benefits were vested based on statements by company officials of their commitment to provide the benefits for the retirees' lifetime. 58 F.3d at 905. This court affirmed the district court's rejection of this testimonial evidence, reasoning that the "retirees' reasonable understanding of their benefits must be limited to the reasonable understanding of the summary plan descriptions or plan documents, due to our strong precedent which precludes informal amendments to ERISA plan benefit plans." Id. at 905-06. Courts outside the Third Circuit have arrived at similar conclusions regarding such testimonial evidence. In Murphy, the Seventh Circuit rejected the testimonies of union employees concerning retiree benefits as "subjective" and "self-serving" extrinsic evidence that cannot create an ambiguity as a matter of law. 61 F.3d at 565; see also Sprague, 133 F.3d at 402-03. Accordingly, the testimonies of union members as to their understanding or belief of the duration of their retirement benefits cannot as a matter of law create an ambiguity in this case.
 
 
 96
 Upon close examination, it is apparent that Sok's testimony suffers from the same infirmity. His testimony concerning vested benefits was based not on the language of the collective bargaining agreements but on his notion of moral responsibility:
 
 
 97
 Q. Mr. Sok, you indicated that during your 1993 conversation with Mr. Orlando out at Associated Spring that you felt that the company had an obligation to provide current retirees these health or life insurance benefits. Do you recall that testimony?
 
 
 98
 A. Yes.
 
 
 99
 Q. What kind of obligation were you referring to? Were you referring to a legal obligation? Moral obligation? What?
 
 
 100
 A. A financial obligation and a moral obligation.
 
 
 101
 Q. Was your opinion in that regard based in any and to any extent on the review of the documents?
 
 
 102
 A. No.
 
 
 103
 Q. You were simply expressing an opinion on what they ought to be doing as a matter of morality?
 
 
 104
 A. Yes.
 
 
 105
 Sok did not testify that Skinner, in agreeing to include the phrases, "will continue" and "shall remain," intended that language to mean that the retiree benefits were vested. If he had, the outcome of this case would no doubt be different. But his testimony, as it stands, manifests nothing more than what he thought should be done with the retiree benefits, not what the CBAs actually provided. As such, the testimony manifests only his subjective intent and cannot be considered objective indicia of the bargaining parties' intent.
 
 
 106
 Oral testimony certainly may be necessary when the terms of the written documents are ambiguous. But when the language itself is not ambiguous, oral testimony may not be used to alter or add terms to a collective bargaining agreement which is otherwise complete. That is the case here, and the appellants' contention that the various deposition testimonies create an ambiguity in the CBAs must be rejected. At best, the CBAs are silent on the specific duration of the retiree benefits. Silence on duration, however, may not be interpreted as an agreement by the company to vest retiree benefits in perpetuity. See Bidlack, 993 F.2d at 608 ("If therefore the collective bargaining agreements in this case were completely silent on the duration of health benefits for retired employees, then . . . we would not allow extrinsic evidence to show that those employees have a perpetual entitlement."); Wise, 986 F.2d at 938 (stating that "[p]laintiffs must assert strong prohibitory or granting language; mere silence is not of itself abrogation" of company's right to change or terminate benefits).
 
 
 107
 There is no doubt that the plight of the retirees in this case is unfortunate. The Seventh Circuit recognized the difficult circumstances in which retirees are placed when benefits are eliminated:
 
 
 108
 We are well aware that it can be a terrible hardship for an elderly person who has been receiving benefits from a former employer suddenly to find the rug pulled out from under her. There is an element of betrayal as well, if the retiree/former employee understood that the "lifetime" health benefits were a form of deferred compensation for her work. But written agreements exist precisely because subjective understandings can vary so much from individual to individual. . . . We are cognizant of the need when a collective bargaining agreement is at issue to respect the specialized usages of the workplace. . . . On the other hand, as we have stressed in [various] cases . . . the written word must prevail over subjective understandings unless one of those gaps "crying out to be filled" exists or the agreement is genuinely ambiguous.
 
 
 109
 Pabst Brewing Co. v. Carrao, 161 F.3d 434, 442 (7th Cir. 1998). The court's statement is particularly apt here, where the retirees clearly believed that their life and medical insurance benefits would continue for their lifetimes. There is no dispute as to this. But based on the discussion provided above, we are compelled to affirm the district court's summary judgment in favor of Skinner.
 
 C. Breach of Fiduciary Duty
 
 110
 The district court also granted Skinner's summary judgment motion with respect to the retirees' breach of fiduciary duty claim. The court concluded that there was no evidence that the company made any affirmative material misrepresentations concerning the duration of retiree benefits, and further that the company was under "no legal obligation . . . [to] advise[ ] retirees that their benefits were not vested." Skinner Engine, 15 F. Supp. 2d at 782. The appellants contend that the district court erred in its findings in this regard. They posit that the hourly workers and retirees were led to believe that their retiree insurance benefits were for life. The company breached its fiduciary duty, they contend, by failing to inform them that the CBAs did not provide lifetime welfare benefits.[6]
 
 
 111
 Section 404(a)(1) of ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries. . . ." 29 U.S.C. S 1104(a)(1). A "fiduciary" under ERISA is any person who "exercises any discretionary control respecting management of such plan . . . or has any discretionary authority in the responsibility in the administration of the plan." 29 U.S.C. S 1002(21)(A). The law in this circuit instructs that "when a plan administrator explains plan benefits to its employees, it acts in a fiduciary capacity." Unisys I , 57 F.3d at 1261 n.10; see also Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133 (3d Cir. 1993); Genter v. Acme Scale & Supply Co., 776 F.2d 1180 (3d Cir. 1985); Hozier, 908 F.2d at 1158. The court in Fischer explained that ERISA permits employers "to wear `two hats,' " as both an employer and a plan administrator. 994 F.2d at 133 (quoting Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1416 (2d Cir. 1985)). When acting in the latter capacity, the employer also acts as a fiduciary. Id.
 
 
 112
 Based upon the obligations imposed by Section 404(a)(1), a fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed. See Unisys I, 57 F.3d at 1261; Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993); Fischer, 994 F.2d at 135; Curcio, 33 F.3d at 238. Failure to carry out the duties imposed by Section 404(a) may subject a fiduciary to direct liability under Section 502(a) of ERISA. A misrepresentation is material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision." Unisys I, 57 F.3d at 1264.
 
 
 113
 To make out a claim for breach of fiduciary duty under ERISA, a plaintiff must show that (1) the company was acting in a fiduciary capacity; (2) the company made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (3) the company knew of the confusion generated by its misrepresentations or its silence; and (4) there was resulting harm to employees. Id. at 1265. For purposes of a breach of fiduciary claim, one assumes the plans did not contractually vest benefits. Thus, the claim focuses not on the company's failure to continue to provide lifetime benefits but on its conduct or actions in leading employees to believe that the plans did.[7] Id.
 
 
 114
 In Unisys I, retirees alleged that their employer breached fiduciary duties by misrepresenting to them that benefits were "for life" when in fact they were terminable by the company. The evidence showed that "[t]he message that medical benefits would last for life was confirmed repeatedly and systematically throughout the . . . organization, by all levels of management, in writing and verbally." Id. at 1260. Evidence also indicated that the highest levels of management recognized that employees believed their medical benefits were vested and could not be taken from them, and that the company knew that employees accelerated their retirement plans based on their belief that by retiring at a certain point in time, they would "lock in" the lifetime coverage that they had under the then current plan. Id. at 1257, 1266.
 
 
 115
 On appeal, this court accepted the district court's findings that the company "affirmatively and systematically represented to its employees that once they retired, their medical benefits would continue for life--even though as the district court concluded in rejecting the retirees' contract claim, the plans clearly permitted the company to terminate benefits." Id. at 1264. This court held that the misrepresentations could form the basis of a breach of fiduciary duty claim by the retirees, stating that "when a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." Id. In this regard, Unisys I was consistent with the Supreme Court's decision in Varity Corp. v. Howe, 516 U.S. 489 (1996).
 
 
 116
 This court was careful to note, however, that "[i]n recognizing the retirees' breach of fiduciary claim here, we do not intend to `create a precedent for any beneficiary to make claims beyond those provided in a plan.' " Id. at 1265 (quoting Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1501 n.6 (3d Cir. 1994)). This court was satisfied that under the particular facts of Unisys I, there was no "conflict with [the court's] policy against informal plan modification." Id.
 
 
 117
 In Fischer, this court held that a plan administrator may not make affirmative material misrepresentations to plan participants concerning changes to employee benefit plans. 994 F.2d at 135. Fischer involved employees who retired shortly before their employer offered an early retirement plan, or "retirement sweetener," which would have provided more beneficial retirement packages. Although the company had announced that it might offer such a plan, they were told by benefits counselors that "no plan was being considered" when employees inquired about its availability. Id. at 132. Although the benefit counselors were technically telling the truth--they had not been informed by the corporation that a retirement sweetener was under serious consideration--this court held that a material issue of fact existed as to whether the employer had breached its fiduciary duty to its employees by responding in a misleading fashion to their questions about the sweetener. Id. at 135. This court held that a "plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan. Put simply, when a plan administrator speaks, it must speak truthfully." Id.
 
 
 118
 The principle that a plan administrator has an affirmative duty to "speak when it knows that silence might be harmful," was reaffirmed in Bixler. There the widow of a plan participant contacted her husband's employer, as well as personnel from the Fund itself, to ask whether there was a death benefit to which she was entitled. She was informed that she and her family were not entitled to continuation coverage under COBRA. The Third Circuit held:
 
 
 119
 If [the employer's agent] knew that Mr. Bixler's death left Mrs. Bixler with substantial unpaid medical expenses and that she could receive reimbursement for those expenses under the Drivers' plan by signing and returning the COBRA notice that [he] had sent to her husband, we believe the failure to advise her of the available benefits might be found to be a breach of fiduciary duty despite the fact that her inquiry was limited to the availability of a death benefit.
 
 
 120
 Bixler, 12 F.3d at 1302. Although the court did not determine whether a breach of fiduciary duty in fact occurred, it observed that the fiduciary's duty to inform "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." Id. at 1300.
 
 
 121
 Bixler specifically adopted the rationale of Eddy v. Colonial Life Insurance Co., 919 F.2d 747 (D.C. Cir. 1990), in which the court held that, once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary. This is so even if that information comprises elements about which the beneficiary has not specifically inquired.
 
 
 122
 In the case at bar, the appellants contend that retiree benefits "were promised habitually and consistently over a course of some 20 years, resulting in the pervasive belief of both management and hourly employees that lifetime post- retirement medical and life insurance benefits would be provided for life." Further, they argue that in light of the fact that "Skinner knew or should have known that the hourly workers and retirees had been led to believe (and without exception) and [sic] did believe that their retiree insurance benefits were for life," the company breached its fiduciary duty by failing to correct the retirees' mistaken belief.
 
 
 123
 The problem with this contention is that there is no competent evidence which suggests that the company made any affirmative misrepresentations concerning the duration of retiree benefits. At best, the evidence indicates that there may have been an historical assumption, perhaps by both sides, that retirement benefits would be for life. There is no competent evidence, however, that the company, as opposed to the facts in Unisys I, affirmatively made representations to the effect that retiree benefits were vested and could never be modified or terminated by the company.
 
 
 124
 Moreover, there is no evidence that suggests that the company stood silent and failed to properly advise employees when specifically asked about the duration of retiree benefits. There is no indication that the company created the belief in the minds of the employees that the retiree benefits could never be changed or terminated. If they did not create this understanding, then the case law discussed above suggests that the company was under no obligation, as far as ERISA is concerned, to correct what turns out to have been a mistaken assumption on the part of the employees.
 
 
 125
 The recent Sixth Circuit decision in Sprague is illustrative. In that case, the company made numerous representations, both in writing and orally, that retirement benefits were for life. Despite this evidence, however, the court rejected the retirees' breach of fiduciary duty claim:
 
 
 126
 In the first place, GM never told the early retirees that their health care benefits would be fully paid up or vested upon retirement. What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes. This was undeniably true under the terms of GM's then-existing plan.
 
 
 127
 Sprague, 133 F.3d at 405.[8] The court further held that there can be no fiduciary duty to disclose the possibility of a future change in benefits. . . . Had an early retiree asked about the possibility of the plan changing, and had he received a misleading answer, or had GM on its own initiative provided misleading information about the future of the plan, or had GM been required by ERISA or its implementing regulations to forecast the future, a different case would have been presented.
 
 
 128
 Id. at 406.
 
 
 129
 Here, the appellants have failed to persuade that Skinner was obligated under ERISA to inform its employees that retiree benefits may at some point in the future be modified or changed. Accordingly, the appellants' breach of fiduciary claim was properly dismissed by the district court.
 
 D. Equitable Estoppel
 
 130
 The district court also dismissed the retirees' equitable estoppel claim, reasoning that "[a]ny alleged detrimental reliance upon Skinner's alleged misrepresentations would not be `reasonable' in light of the unqualified reservation of rights clauses in the plans." Skinner Engine, 15 F. Supp. 2d at 782. The appellants challenge the district court's ruling in this regard, arguing that the reservation of rights clauses were contained in the SPDs which were not provided to the retirees. Because the SPDs were not provided to plan participants and beneficiaries as required by ERISA and the regulations promulgated there under, the appellants contend, the reservation of rights clauses could not defeat their equitable estoppel claim.
 
 
 131
 In Unisys II, this court held that an "ERISA beneficiary may recover benefits under an equitable estoppel theory upon establishing a material misrepresentation, reasonable and detrimental reliance upon the representation, and extraordinary circumstances." 58 F.3d at 907; see also Curcio, 33 F.3d 235. Applying this standard to the facts therein, the Unisys II court held that
 
 
 132
 [d]ue to the unambiguous reservation of rights clauses in the summary plan descriptions by which Unisys could terminate its retiree medical benefit plans, the regular retirees cannot establish "reasonable" detrimental reliance based on an interpretation that the SPDs promised vested benefits. The retirees' interpretation of the plans as providing lifetime benefits is not reasonable as a matter of law because it cannot be reconciled with the unqualified reservation of rights clauses in the plans.
 
 
 133
 58 F.3d at 907.
 
 
 134
 The district court in this case did rely solely on the reservation of rights clauses in the SPDs in dismissing the appellants' estoppel claim. But as conceded by Skinner, SPDs were not provided to plan beneficiaries. See 29 U.S.C. S 1022(a)(1); see also Pisciotta v. Teledyne Indus., Inc., 91 F.3d 1326, 1329 (9th Cir. 1996) ("[A]n employer must provide employees with a written Summary Plan Description . . . which describes the employees' plan."). Indeed, although Skinner asserts that SPDs were provided upon request, there is no evidence in the record indicating that SPDs were ever provided to plan beneficiaries. Under these circumstances, it was improper for the district court to rely solely on plan documents in rejecting the appellants' estoppel claim. Perhaps the district court attempted too arduously to make the facts of this case fit with the facts of Unisys II. However, in that case, the parties conceded that the summary plan descriptions were the controlling documents. Here, the exact opposite is true: neither party contends that the SPDs constituted governing plan documents.
 
 
 135
 Despite the district court's erroneous reliance on the SPDs in disposing of the appellants' estoppel claim, however, a reversal of its summary judgment ruling is not in order under the circumstances of this case. That is because there is no evidence to suggest that the appellants are able to satisfy any of the elements of the equitable estoppel cause of action. Certainly, there is no competent evidence of material misrepresentations, reasonable detrimental reliance on the part of the appellants, or extraordinary circumstances. The appellants bear the burden of proof on each estoppel element. See Kurz v. Philadelphia Elec. Co., 96 F.3d 1544, 1554 (3d Cir. 1996), cert. denied, 118 S.Ct. 297 (1997). In particular, there is no evidence of detrimental reliance or extraordinary circumstances. This court has had occasion to make clear that to show extraordinary circumstances, a claimant must produce evidence of "affirmative acts of fraud or similarly inequitable conduct by an employer, . . . misrepresentations that arise[ ] over an extended course of dealings between parties, . . . [or] the vulnerability of particular plaintiffs." Id. at 1553. Here, the appellants have presented no evidence which supports an inference of bad faith and/or fraudulent conduct on the part of the appellee, misrepresentations over an extended course of dealing, or the particular vulnerability of the appellants.
 
 
 136
 Indeed, this case is not unlike the recent Second Circuit decision in Devlin v. Transportation Communications International Union, 173 F.3d 94 (2d Cir. 1999), in which retired union employees challenged their former employer's amendment of a welfare benefit plan to require retirees to pay a monthly premium for medical benefits. Those benefits were previously provided at no charge. As part of their evidence, the retirees claimed that they were told on a number of occasions by high officials of the union that their health benefits would be paid throughout their retirement. Id. at 97. In addition, the retirees proffered a letter from the president of the union to the same effect, as well as an affidavit from an ex-official in which he stated that he and other officials communicated to members and retirees that their health benefits would always be free. Id.
 
 
 137
 The Second Circuit assumed that the retirees could satisfy the material misrepresentation element. However, the court rejected the claim based on its view that the retirees had failed to adduce evidence sufficient to show detrimental reliance or extraordinary circumstances:
 
 
 138
 Admittedly, there is evidence in this record to support the notion that some employees--though not necessarily any of the appellants--considered the promised medical benefits in timing their retirements. But reliance is one of the four basic elements of promissory estoppel, and would not by itself render this case "extraordinary". . . . In the instant case . . . there is no evidence to suggest that appellees sought the retirement of any of the appellants, or that the promise of free, lifetime health benefits was used to intentionally induce any particular behavior on appellants' part.
 
 
 139
 Id. at 102.
 
 
 140
 In contrast to the facts of Devlin, there is absolutely no evidence in this record that shows that any of the appellants considered the promise of lifetime health and life insurance benefits in timing their retirements. In fact, the appellants have made no effort to show that genuine issues of material fact exist with respect to any of the estoppel elements. Accordingly, the district court's dismissal of the equitable estoppel claim is affirmed.
 
 III. CONCLUSION
 
 141
 For the foregoing reasons, the district court's order granting Skinner's motion for summary judgment is affirmed. The parties will bear their own costs on this appeal.
 
 
 
 NOTES:
 
 
 *
 Honorable Harold A. Ackerman, Senior Judge of the United States District Court for the District of New Jersey, sitting by designation.
 
 
 [1]
 Skinner manufactures and rebuilds Banbury intensive mixing machines for the rubber, plastics, and chemical industries. The company also manufactures steam turbines and engines.
 
 
 [2]
 The effective dates of the CBAs are as follows:
 September 1, 1971 to August 31, 1974
 September 1, 1974 to August 31, 1977
 September 1, 1977 to August 8, 1980
 September 20, 1980 to September 19, 1981
 September 20, 1981 to September 22, 1984
 July 1, 1986 to June 30, 1989
 July 1, 1989 to June 30, 1993
 From 1984 through 1986, the employees worked without a contract. On July 1, 1987, the 1986-1989 CBA was amended by what was commonly described as an "economic reopener" agreement.
 
 
 [3]
 Health care benefits to retirees were provided by Blue Cross-Blue Shield of Western Pennsylvania and Pennsylvania Blue Shield. Commercial Union Life Insurance Company of America provided life insurance benefits to retirees beginning in 1986. The Summary Plan Descriptions ("SPDs") prior to 1993 contained general language concerning the continuation of the plan, as exemplified by the following:
 CONTINUITY OF THE PLAN
 The Plan Sponsor and your employer intend to continue the Plan indefinitely. Since future changes and conditions cannot be foreseen, we do reserve the right to suspend, terminate or modify the Plan at any time when deemed to be in the best interest of the participating member firms.
 The SPDs, again with the exception of the 1993 SPD, also set forth standard termination of coverage provisions, as exemplified by the following:
 TERMINATION OF COVERAGE
 Coverage ends:
 * If you are no longer an "eligible employee";
 * If your dependent does not fit one of the classes of covered dependents;
 * If premiums are not paid on time;
 * If the plan is terminated, or your employer stops participating in it.
 The appellants make much of the fact that the district court relied, at least in part, on the above-quoted provisions of the SPDs in dismissing their claims. While summary plan descriptions are ordinarily considered part of the ERISA plan documents, see Jensen v. SIPCO, Inc., 38 F.3d 945, 949 (8th Cir. 1994); Alday v. Container Corp. of Am., 906 F.2d 660, 665 (11th Cir. 1990), Skinner has conceded that the SPDs were not the controlling documents in this case. While it may have been error for the district court to rely on SPDs which both parties acknowledge do not constitute the controlling documents in this case, we do not believe that reversal of the district court's opinion is in order. The appellants do not contend that the SPDs established vested rights to the medical benefits. Rather, their position is that the SPDs in no way defeat their claim for benefits, rights which they contend were vested under the CBAs. This, however, presumes that the CBAs established such a right to lifetime benefits in the first place. As will be made plain below, this assumption is incorrect. Thus, whether the SPDs could properly defeat the appellants' claim for vested benefits is not a relevant issue in this case.
 
 
 [4]
 The FASB is a private professional organization which establishes standards for financial accounting and reporting. Those standards govern, for example, the preparation of financial reports. They are officially recognized as authoritative by, among others, the Securities and Exchange Commission.
 
 
 [5]
 Put another way, FASB 106 required employers to "reflect on their balance sheets the present value of the estimated future costs for retirees' medical benefits." Wise v. El Paso Natural Gas Co., 986 F.2d 929, 932 (5th Cir. 1993). The Wise court further explained:
 The new and much-publicized accounting rule . . . requires employers to adopt accrual accounting to expense accumulated benefits during employees' working careers rather than the past practice of waiting until the benefits are actually paid. While the change does not represent reductions in cash flow, it dramatically erodes estimates of net worth and pre-tax earnings as employers recognize the present value of projected post-retirement benefits. El Paso is not alone in its strong response; FASB 106 has combined with other factors to redden the financial statements of many companies, particularly those providing generous benefits.
 Id. at 932 n.3.
 
 
 [6]
 It is clear that even if a court rejects a breach of contract claim, a party may nevertheless pursue a breach of fiduciary duty cause of action. See In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 57 F.3d 1255, 1264 n.13 (3d Cir. 1995) ("Unisys I").
 
 
 [7]
 Indeed, an employer administering a retiree welfare plan has no fiduciary duty to continue providing health benefits after the expiration of the contract requiring such benefits. See Senn, 951 F.2d at 817-18; Musto v. American Gen. Corp., 861 F.2d 897, 911-12 (6th Cir. 1988).
 
 
 [8]
 In a similar vein, the Fourth Circuit recognized that explanations of benefits provided to employees
 tend to sound promissory by their very nature. While these explanations may state a company's current intentions with respect to the plan, they cannot be expected to foreclose the possibility that changing financial conditions will require a company to modify welfare benefit plan provisions at some point in the future.
 Gable, 35 F.3d at 857.