Larry **BECKER; Stephen Capkovic, III; Lee R. Christ; James Daquisto; Michael Dreher; Randy Frey; Robert Gaston; Charles Grohotolski; Barry Jones; John Judd; Dennis Knopf; Wayne Labaty; William Lehman; Thomas Litchauer; Bruce McFarland; Michael Meyers; Samuel Olive-**

---

ria; Robert Peters; Sherwood Peters; Thomas Roberts; Katherine Takacs; Scott Takacs; Anthony Tratnyek; Claire Williams; Dennis C. Acker; Richard Balliet; Alexander Bandi, Jr.; Stephen R. Becker; Timothy S. Beller; Anita L. Belles; Thomas F. Benner, Jr.; Judith A. Binder; David J. Bobo; James P. Burger, Jr.; Ralph A. Christman; Lavern R. Clater; Alfred W. Dilabio; Michael A. Dilcher; Wayne R. Ernst; Daniel H. Freed; Edward A. Freed; John L. Golden; Manuel I. Guedes; Dennis P. Hafer; Sheila K. Hansler; Claytor Howard; Jeffrey Husack; James P. Kalavoda; Jozef Kazimir; John S. Kerbacher; Anthony A. Kiss; Joseph J. Kiss; Stephen J. Kiss; Michael Klucar; Dennis G. Koehler; Andrew J. Korutz; Richard D. Dratzer; Thomas A. Marshman; Ronald P. Marcks; Jan A. Merkel; Jane L. Michael; Chester C. Miller; Paul J. Mishko, Jr.; Dennis R. Pascoe; Thomas E. Pruzinsky; Joseph M. Rice; Bruce L. Rothrock, Jr.; Edward R. Sajt; Gerald Robert Schueck; Peter M. Sinclair; David W. Smith; Dale R. Snyder; Maryann J. Sosnowski; Darrel C. Stofflet; George M. Szep; John J. Szilagyi; Bruce Torrence; Cheryl A. Yandrasits, Appellants,

v.

MACK TRUCKS, INC.

No. 00–4414.

United States Court of Appeals, Third Circuit.

Argued Sept. 26, 2001.

Opinion Filed Feb. 21, 2002.

Quintes D. Taglioli (Argued), Markowitz & Richman, Allentown, PA, Attorney for Appellants.

Edward T. Ellis (Argued), Jeanne L. Bakker, David E. Brier, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, Attorneys for Appellee.

Mary Ellen Signorille, American Association of Retired Persons, Washington, DC, Attorney for Amici–Appellants American Association of Retired Persons and National Employment Lawyers Association.

Before: ROTH, AMBRO and FUENTES, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

This case requires us to decide whether § 510 of the Employee Retirement and Income Security Act, 29 U.S.C. § 1140, applies to rehiring decisions. Plaintiffs are former employees of defendant Mack Trucks, Inc., who lost their jobs when Mack closed its Allentown plant in 1987. Some plaintiffs had vested pension rights at the time they were laid off. Others merely had credit for past service. In 1997, when the economy had improved, Mack needed to hire workers for its Macungie plant. By this time, all the plaintiffs had either exhausted or forfeited any recall rights with Mack. Mack declined to rehire plaintiffs because to do so would create a future pension liability disproportionately greater than that incurred by hiring employees without past service or pension credit. Plaintiffs contend that Mack's decision amounts to unlawful "discrimination" under § 510 of ERISA.

The District Court rejected plaintiffs' claims in their entirety on a motion for summary judgment. We will affirm that decision. We agree, as an initial matter, that those plaintiffs without vested pension rights lack standing to pursue their § 510 claim. *See Shawley v. Bethlehem Steel Corp.*, 989 F.2d 652 (3d Cir.1993). *Shawley* does not foreclose standing for those

plaintiffs with vested rights, however; thus, we reach the merits of their claims and resolve the question left unanswered in *Shawley*: Whether an employer's refusal to rehire based on a desire to avoid increased pension liability is prohibited activity under § 510. *Id.* at 655 n. 5. We conclude that § 510 does not proscribe Mack's refusal to rehire the vested plaintiffs.

## I. FACTS

Defendant Mack Trucks manufactures and distributes heavy-duty trucks. It operates an assembly plant in Macungie, Lehigh County, Pennsylvania, and, until 1987, operated machining and fabrication plants in Allentown, Pennsylvania. Employees in both locations are and were represented by the United Automobile, Aerospace and Agricultural Implement Workers (UAW) and UAW Local 677. The plants in Allentown and Macungie were covered by the Mack–UAW Master Agreement as well as by local agreements.

The Master Agreement includes, as Appendix A, the Mack–UAW Pension Plan, which is subject to renegotiation every time the Master Agreement itself is renegotiated. Prior to January 1, 1989, an employee covered by the Plan became vested under the Plan after ten years of service. On and after January 1, 1989, employees became vested after five years of service. The Plan also provided that any rehired former employee would be entitled to credit for past service no matter how long the break between employment periods.

When Mack closed its facilities in Allentown in 1987, a number of employees lost their jobs. Some transferred or were absorbed into other Mack plants. Others,

like the plaintiffs, either accepted a cash "dislocation benefit" to relinquish their seniority rights or were laid off and eventually exhausted their recall rights. Some plaintiffs were laid off before meeting the ten year vesting requirement in place at the time; other plaintiffs were fully vested by the time they were laid off.

In 1997, a combination of rising production needs and workforce attrition made it necessary for Mack to hire new employees at the Macungie plant. Although Mack's former employees were initially the first to be offered new jobs, Mack soon realized that a rehired former employee with credited service under the Plan would receive a disproportionately larger pension than would a newly hired employee.

There are three reasons for this difference in pension benefits between former employees and new hires. First, former employees who had not vested under the Plan would receive credit for past service and would become vested in less than the five years applicable to new hires.[1] Second, former employees were more likely to become eligible for early retirement before age 62. Third, former employees would be entitled to raise their pension rate on retirement above the lower benefit rate in place as of the day they had been laid off in 1987.

As a result, in July of 1997 Mack decided to stop hiring former employees with credited service under the plan. All 78 plaintiffs are former Mack employees who were not considered for re-employment due to Mack's pension liability avoidance policy.

The plaintiffs brought a complaint seeking injunctive and monetary relief based

---

**1.** Because the Plan's vesting period of ten years employment had been reduced to five years in 1989, the unvested former employees with between five and ten years credited service would be credited on rehire with past service sufficient for vesting.

on allegations that Mack violated 29 U.S.C. § 1140 when it refused to rehire them. After Mack filed a timely answer admitting the essential facts of the complaint, the parties brought cross-motions for summary judgment and asked the District Court to rule on a core set of stipulated facts. On November 30, 2000, the District Court found that Mack's decision not to rehire plaintiffs was not unlawful and entered judgment in favor of Mack. Plaintiffs filed a timely appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

We have federal question jurisdiction over this case under 28 U.S.C. § 1331 because plaintiffs have alleged a violation of § 510 of ERISA, 29 U.S.C. § 1140. We also have appellate jurisdiction to review the District Court's November 30, 2000, order granting summary judgment under 28 U.S.C. § 1291.

■ The cross-motions for summary judgment were submitted with no dispute as to a core set of stipulated facts, and the District Court resolved only issues of law in its ruling. As a result the standard of our review for the District Court's decision is plenary. *See West American Insurance Co. v. Park*, 933 F.2d 1236, 1238 (3d Cir. 1991).

## III. DISCUSSION

### A. STANDING

We first address whether the non-vested plaintiffs have standing to sue under § 510. A plaintiff may bring a civil action under § 510 of ERISA if he is a "participant or beneficiary" of a benefit plan. 29 U.S.C. § 1132(a)(1)(B). The statute de-

fines a participant as "any employee or former employee of an employer … who is or may become eligible to receive a benefit of any type from an employee benefit plan …" *Id.* at § 1002(7).

■ While there is no dispute that the non-vested plaintiffs are former employees, it is unclear whether they are "participants" under § 1002(7). To resolve this issue we must decide whether the non-vested plaintiffs, as former employees,[2] have (1) a "reasonable expectation of returning to covered employment" or (2) " 'a colorable claim' to vested benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). While it is clear that the vested plaintiffs have standing under the second element, our opinion in *Shawley v. Bethlehem Steel Corp.*, 989 F.2d 652 (3d Cir. 1993), establishes that the non-vested plaintiffs fail both elements of *Firestone*.

### i. Do non-vested plaintiffs have a reasonable expectation of returning to covered employment?

■ Like the plaintiffs in *Shawley v. Bethlehem Steel Corp.*, 989 F.2d 652 (3d Cir.1993), the non-vested plaintiffs lack a reasonable expectation of returning to covered employment. The plaintiffs in *Shawley* were a group of former employees who had been laid off for several years. When their previous employer considered rehiring them but refused to do so, they sued under ERISA. The employees claimed that the employer violated the law by basing its hiring decision upon a desire to avoid increased pension liability. *Shawley*, 989 F.2d at 654–55. Under those facts, "where the collective bargaining agreement expressly covers recall rights, and former employees were not hired before

---

**2.** A current employee who is constructively discharged in violation of ERISA need not show a reasonable expectation of returning to covered employment to establish standing under ERISA. *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 922 (3d Cir.1990).

the expiration of those rights—we believe plaintiffs had no reasonable expectation of reemployment." *Id.* at 658.

The non-vested plaintiffs here are indistinguishable. Their collective bargaining agreement also covers recall rights. By the time Mack considered rehiring them, all of their recall rights had either expired or been waived in lieu of dislocation benefits. Thus, under our holding in *Shawley*, non-vested plaintiffs lack a reasonable expectation of reemployment.

The non-vested plaintiffs contend nevertheless that their reasonable expectation of reemployment and the consequent vesting of their benefits would have been realized "but for" Mack's refusal to rehire them. In support of this proposition, they cite *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209 (5th Cir.1992). Their argument, however, ignores our earlier rejection of standing for similarly situated plaintiffs even under the *Christopher* "but for" analysis. *Shawley*, 989 F.2d at 658–59. As we explained there, the "but for" analysis grants standing only when the employer's action "in and of itself divests aggrieved parties of their status as covered employees." *Id.* (quoting *Christopher* at 1222).

The "but for" test does not establish standing for former employees who are not rehired after being laid off due to an economic downturn:

> Bethlehem Steel's refusal to rehire [plaintiffs] did not "in and of itself" strip [them] of their employee status ... Plaintiffs were not terminated, constructively discharged, or tricked into retiring from Bethlehem Steel—they were laid off because of an economic downturn in the steel industry.

*Shawley*, 989 F.2d at 659. Thus, even if there were situations in which the "but for" test is applicable—a question we need

not resolve today—it does not support standing for plaintiffs here. As in *Shawley*, Mack's refusal to rehire former employees did not "in and of itself" strip them of their employee status. The plaintiffs initially lost employee status when they were laid off many years earlier.

### ii. Do non-vested plaintiffs have a colorable claim to vested benefits?

The non-vested plaintiffs also lack a colorable claim to vested benefits. To satisfy this element, a claimant "must have a colorable claim that (1) he or she will prevail in a suit for benefits or that (2) eligibility requirements will be fulfilled in the future." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117–18, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). We have held, under the *Firestone* standard, that non-vested, credited service "gave rise to only a forfeitable benefit," and that such a "contingent claim for future benefits does not satisfy the dictates of Firestone." *Shawley*, 989 F.2d at 657; *see also Agathos v. Starlite Motel*, 60 F.3d 143, n. 10 (3d Cir. 1995) ("We have previously held that a claim for credited service does not give rise to a 'colorable claim' to vested benefits.").

*Shawley* involved the denial of ERISA standing to a group of non-vested former employees. They claimed that credited service, which counted as an accrued, forfeitable benefit under the rule of parity,[3] established standing because that benefit was not yet forfeited and would vest under the requirements of the Internal Revenue Code if the plan were to be terminated prior to the exhaustion of their credited service. *Shawley*, 989 F.2d at 656–57. We rejected this argument on the ground that such "contingent" benefits do not es-

---

**3.** 29 U.S.C. § 1053(b)(3)(D)(i)(II).

tablish a colorable claim to vested benefits under the *Firestone* standard.

The non-vested plaintiffs attempt to distinguish *Shawley* by claiming that the rule of parity does not apply to their benefit agreement with Mack and that they cannot forfeit their past credited service because they have the right to retain it indefinitely after termination. This distinction is, however, without significance. Whether past credited service is forfeitable after a given period of time or never forfeitable does not change the outcome. "Credited service" is not the same thing as the "right to benefits." It is the *nonforfeitable* right to benefits, not the *contingent*, albeit nonforfeitable, right to credited service that is the relevant standard under *Firestone*. And, indeed, when the former employees in *Shawley* brought suit, they had not yet lost their right to credit for past service; it remained a contingent right until their re-employment within the period designated by the rule of parity. Thus, in *Shawley* we determined that a legally unenforceable claim to *contingent* benefits cannot establish a colorable claim to *vested* benefits under *Firestone*. The benefits here, arising from the non-vested plaintiffs' credited service, are materially indistinguishable from those in *Shawley*. They are contingent upon re-employment with Mack. For that reason, the non-vested former employees lack standing.

Nor will we deviate from our opinion in *Shawley* based on the Supreme Court's intervening decision in *Inter–Modal Rail Employees Assoc. v. Atchison, Topeka, and Santa Fe*, 520 U.S. 510, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997). *Inter–Modal* does not overrule or otherwise limit the efficacy of the Court's earlier opinion in *Firestone* or our standing analysis in

*Shawley*. *Inter–Modal* is distinguishable because it does not deal with the threshold issue of standing and because it concerns not vested pension benefits, but health and welfare benefits, which do not vest, and whether health and welfare benefits are protected by § 510. *Id.* at 513, 117 S.Ct. 1513.

Thus we reject the non-vested plaintiffs' request for standing under the binding authority of *Firestone* and *Shawley*.[4]

Because the vested plaintiffs do have standing, however, we will now turn to the merits of their claims.

**B. MERITS**

◼◼◼ The vested plaintiffs allege that Mack violated § 510 of ERISA, 29 U.S.C. § 1140, when it refused to rehire them in order to avoid increased pension liability. In order to demonstrate a prima facie case under § 510, a plaintiff must show "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir.1987). In this case, the parties do not dispute that Mack acted with the purpose of preventing pension benefit increases to previously terminated employees. The only remaining issue, then, is whether Mack engaged in prohibited conduct under § 510 in its refusal to rehire the vested plaintiffs.

◼◼◼ To discern whether Congress intended in § 510 to regulate rehiring decisions, "we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S.Ct.

---

4. The plaintiffs here and in *Shawley* did not have any enforceable right to recall. We are not considering here what impact, if any, an enforceable right to recall might have on the standing issue.

478, 112 L.Ed.2d 474 (1990). Based on that evidence, we decline to expand the reach of § 510 to cover the rehiring of former employees with no right or expectation of future employment. *See, e.g., West v. Greyhound Corp.,* 813 F.2d 951, 955 (9th Cir.1987) ("we hold that no violation of section 510 of ERISA is shown where the seller of a business terminates employment under the provisions of a collective bargaining agreement and the purchaser refuses to hire any of the employees because they refuse to accept a reduction of unaccrued employee benefits"); *Shawley v. Bethlehem Steel Corp.,* 784 F.Supp. 1200, 1202–04 (W.D.Pa.1992). Both the text and purpose of § 510 support the result we reach today.

### i. The text of § 510

We begin, as we must, with the language of § 510:

**Interference with protected rights**. It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan

. . . . .

29 U.S.C. § 1140.

 The plain language of § 510 omits a refusal to "rehire," "hire" or to take any action related to hiring from its enumeration of prohibited acts. Plaintiffs argue that this makes no difference because one definition of "discriminate"—"to make a difference in treatment ... on a basis other than merit," *see Webster's Ninth New Collegiate Dictionary* (1986)—encompasses hiring decisions. We reject this invitation to construe the word "discriminate" out of context. Instead, we heed the Supreme Court's instruction that we "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States National Bank of Oregon v. Independent Insurance Agents of America,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850)). This background makes clear that the inclusion of "discriminate" in the text was not intended to bear the broad meaning suggested by plaintiffs.

The more limited meaning of "discriminate" becomes clear when we consider the manner in which Congress traditionally has proscribed discrimination in hiring under employment regulatory schemes. When § 510 is compared with the statute upon which it was modeled—section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3)[5]—the omissions in § 510 reveal that Congress did not intend to regulate hiring decisions under ERISA.

In the NLRA, Congress specifically stated that it "shall be an unfair labor practice for an employer ... (3) by *discrimination in regard to hire* or to discharge any individual or otherwise to discriminate against any individual." *Id.* (emphasis added). Thus, Congress knows how to forbid discrimination in hiring, and when it wishes to do so it will use the word "hire." Cf., *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 485, 116 S.Ct. 1251, 134

---

**5.** "The legislative history of ERISA does make clear ... that the statute was modeled on § 8(a)(3) of the National Labor Relations Act." *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1483 (4th Cir.1996); 119 Cong. Rec. 30374 (Statement of Sen. Hartke), *reprinted in*

2 *Legislative History of the Employee Retirement Income Security Act of 1974,* at 1775 (1976) ("The language [of ERISA § 510] parallels section 8(a)(3) of the National Labor Relations Act....").

L.Ed.2d 121 (1996) ("Congress ... demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and that the language used to define the remedies under the RCRA does not provide that remedy.").

Based on Congress's past usage, if Congress intended that § 510 apply to hiring practices, it would have included the word "hire" in the string of denominated employment practices. We agree with the District Court that the express language used to regulate hiring practices in the NLRA, as well as other employment statutes,[6] implies that the omission of such language from § 510 was deliberate.[7]

### ii. The purpose of § 510

We are also convinced that we should reject the vested plaintiffs' broad definition of "discriminate" because it would "produce a result at odds with the purposes underlying the statute." *Watt v. Western Nuclear*, 462 U.S. 36, 56, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983); *see also Brotherhood of Locomotive Engineers v. Atchison, Topeka, and Santa Fe Railroad*, 516 U.S. 152, 157, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996) (interpreting statute in accordance with purpose of statutory scheme). ERISA is designed to protect benefits promised to an employee arising from a pre-existing employment relationship. Though the vested plaintiffs once had an employer-employee relationship with Mack, their complaint does not address a deprivation of any preexisting ERISA or recall rights arising out of their former employment.

Instead, plaintiffs seek protection as job applicants. Such protection is inconsistent with Congress's purpose in enacting ERISA, as evidenced by express statutory language, opinions interpreting § 510, and by that provision's legislative history. *See generally* James F. Jorden, Waldemar J. Pflepsen, Jr., & Stephen H. Goldberg, *Handbook on ERISA Litigation* § 8.01[B]–[C] (2d ed. 2000 Supplement).

As an initial matter, it is axiomatic that "ERISA neither mandates the creation of pension plans nor in general dictates the benefits to be afforded once a plan is created." *Smith v. Contini*, 205 F.3d 597, 602 (3d Cir.2000). It is only after an employer chooses to provide a pension plan that ERISA mandates vesting and other rights designed to safeguard employees' expectations with regard to promised benefits. Indeed, the explicitly stated policy behind ERISA is Congress's desire to protect employees' promised benefits. 29 U.S.C. § 1001(a).

Section 510 establishes an important check on employers' ability to undermine ERISA's protections for promised benefits: "Congress viewed [§ 510] as a crucial part of ERISA because, without it, employers would be able to circumvent the provision of promised benefits." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 143, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990);

---

**6.** Other employment statutes that proscribe discriminatory hiring, such as Title VII, the Age Discrimination in Employment Act, and the Americans with Disabilities Act, do so explicitly. *See, e.g.,* 42 U.S.C. § 2000e–2(1) (employer may not "fail or refuse to hire ..."); 29 U.S.C. § 623(a)(1)(same); 42 U.S.C. § 12112(a) & (b)(5)(B) ("No covered entity shall discriminate ... in regard *to job application procedures, the hiring,* advancement, or discharge of employees"; the "term 'discrimi-

nate' includes—(B) denying employment opportunities to a *job applicant* or employee who is an otherwise qualified individual ...") (emphasis added).

**7.** Thus we need not reach the question of whether "discriminate" is similar in nature to the preceding terms "discharge, fine, suspend ..." under the *ejusdem generis* canon of statutory construction.

*Inter–Modal Rail Employees Assn. v. Atchison, Topeka, and Santa Fe,* 520 U.S. 510, 515, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997) ("§ 510 helps make promises credible") (citing *Heath v. Varity Corp.,* 71 F.3d 256, 258 (7th Cir.1995)). Section 510 safeguards promised benefits by prohibiting "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension benefits." *Gavalik,* 812 F.2d at 851. Congress has also provided stiff criminal penalties for employers that take coercive action to prevent employees from obtaining benefits. 29 U.S.C. § 1141; *West v. Butler,* 621 F.2d 240, 243 (6th Cir.1980).

While termination of employment is the prototypical action Congress intended to cover in § 510, that section also reaches employee harassment which falls short of firing. Legislative history reveals that the term "discriminate" was used in order to reach conduct "which does not say that one is fired, but makes living such a hell that a person wishes he did not have to hang on and endure," 119 Cong. Rec. 30374 (Statement of Sen. Hartke), *reprinted in 2 Legislative History of the Employee Retirement Income Security Act of 1974,* at 1774–75 (1976);[8] *see also McGath v. Auto–Body North Shore, Inc.,* 7 F.3d 665, 669 (7th Cir.1993) (§ 510 "protects the employee not only against the classical forms of employer harassment that might occasion the loss of benefits, but also against the more atypical forms of employer misconduct that can produce the same result.").[9] Congress's intent to provide a broad array of safeguards for existing employment relationships by no means suggests, however, that it intended to regulate actions taken against a *potential* employee.

Unlike a discharge or other workplace harassment, a failure to hire does not amount to a circumvention of promised benefits because job applicants who have yet to be hired have not been promised any benefits. In fact, we have held that "discriminate" as used in § 510 is "limited to actions affecting the employer-employee relationship." *Haberern v. Kaupp Vascular Surgeons Ltd.,* 24 F.3d 1491, 1503 (3d Cir.1994); *accord Fischer v. Philadelphia Elec. Co.,* 96 F.3d 1533, 1543 (3d Cir.1996) ("under the law of this circuit, suits for discrimination under § 510 are 'limited to actions affecting the employer-employee relationship'"); *see also Andersen v. Chrysler Corp.,* 99 F.3d 846, 856 (7th Cir. 1996) ("§ 510 applies only in instances in which an employer wrongfully alters the employment relationship to prevent benefits rights from vesting"); *Woolsey v. Marion Labs., Inc.,* 934 F.2d 1452, 1461 (10th Cir.1991) (plaintiff had no actionable claim under § 510 when "Administrators' denial has not affected Woolsey's employment sit-

8. Plaintiffs also claim that § 510's legislative history supports a broader interpretation of the term "discriminate." We disagree. The provisions upon which they rely discuss "interfer[ence] with [an employee's] rights which are protected under the Act," or "discriminatory conduct toward participants and beneficiaries which is designed to interfere with the attainment of vested benefits or other rights under the bill" H.R. Conf. Rep. No. 93–1280, 93d Cong., 2d Sess. (1974) (Joint Explanatory Statement of the Committee of Conference), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5110 & 5188. These passages contain no suggestion that Congress intended to protect the rights of job applicants in addition to the rights arising from an employer-employee relationship.

9. To draw on an example from popular culture, consider the plight of Milton in Michael Judge's movie *Office Space.* Although Milton's employer had decided to lay him off years ago, his manager never bothered to formally discharge him. Instead the company attempted to realize its desire to be rid of Milton by moving his office to a dark basement and asking Milton to help to get rid of the cockroaches there.

uation").[10] The language enacted by Congress simply does not extend to actions taken before an employer-employee relationship exists.

Our recent decision in *Eichorn v. AT & T Corp.*, 248 F.3d 131 (3d Cir.2001), is not to the contrary. That case involved a restrictive covenant preventing employees of a divested subsidiary company from returning to the parent corporation group until after their pension bridging rights had lapsed. *Id.* at 149. The stated purpose of the restrictive covenant was to prevent experienced employees from leaving the subsidiary when it was purchased by a third-party. The third-party, however, determined not to offer a defined pension benefit program. Thus, the restrictive covenant had the effect of separating the employees from the parent company in a manner that eliminated their accrued pension benefits. We concluded that plaintiffs had averred sufficient facts to state a claim against the parent company under § 510.

In sum, § 510 simply does not require that employers blind themselves to the effect on future pension liability when making hiring decisions. Thus we will implement Congress's policy by following the construction of § 510 that is best supported by the text and by the limited purpose of ERISA.

## IV. CONCLUSION

Plaintiffs, in their ERISA claims, have attempted to stretch ERISA's statutory language well beyond the purpose intended by Congress. Today we decline their invitation to extend the protections of § 510 of ERISA to cover Mack's decision not to rehire plaintiffs. We will, therefore, affirm the granting of summary judgment in favor of defendant Mack Trucks, Inc.

---

**10.** The Fifth and Sixth Circuits have stated that § 510 "reaches further than the employment relationship" in cases where plaintiffs are discriminated against because they have exercised their ERISA rights. *Mattei v. Mattei*, 126 F.3d 794, 804 (6th Cir.1997); *Heimann v. Nat'l Elevator Industry Pension Fund*, 187 F.3d 493, 507 (5th Cir.1999). We reject these cases to the extent they conflict with our decision in *Haberern*, which is binding and, we believe, correctly decided. Moreover, both the Fifth and Sixth Circuit's holdings are distinguishable from the case at hand. They address rights stemming from a pre-existing employment relationship, rather than rights arising from a prospective employment relationship.