

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-22-2004

# Lettrich v. JC Penney Co Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-4476

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Lettrich v. JC Penney Co Inc" (2004). *2004 Decisions.* Paper 1078.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1078

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 02-4476
_____

JOSEPH R. LETTRICH, AND ALL
OTHERS SIMILARLY SITUATED,

Appellant

v.

J.C. PENNEY COMPANY, INC.

_____

On Appeal From the United States District Court
for the Western District of Pennsylvania
(Dist. Court No.  98-cv-00137)
District Court Judge: Hon. Donald J. Lee

_____

Argued: October 21, 2003

Before:  ALITO, FUENTES, and ROSENN, Circuit Judges

(Opinion Filed: January 22, 2004)

JEROME K. LIPSICH (argued)
J.C. Penney Company Legal Dept.
P.O. Box 10001
Dallas, TX 75301-1105
*Counsel for Appellant*

DANIEL W. ERNSBERGER (argued)
Behrend & Ernsberger
306 Fourth Avenue
Suite 300
Pittsburgh, PA 15222

_____

OPINION OF THE COURT
_____

PER CURIAM:

In this appeal, Joseph R. Lettrich challenges the District Court's pretrial denial of class certification, several evidentiary rulings, several findings of fact and conclusions of law, and the final judgment in favor of J.C. Penney. In 1988, J.C. Penney created and adopted a Separation Allowance Program ("the Plan") under ERISA for its profit-sharing associates. In 1993, J.C. Penney terminated the Plan. Following corporate restructuring that substantially reduced Lettrich's income and bonuses, he ended his employment with J.C. Penney and unsuccessfully attempted to collect benefits under the Plan.

Lettrich asserts that he has "vested rights" under the terminated Plan. He also argues that, even if the proper termination of the Plan would have divested him of his vested rights, the Plan's termination was ineffective as to him, because he did not receive proper notice. Finally, Lettrich argues that all similarly situated Thrift Drug associates had vested rights and must also be paid. We affirm.

**I.**

In 1975, Lettrich was employed as a pharmacist by the Thrift Drug Division of J.C. Penney. In March 1988, J.C. Penney implemented the Plan for its profit-sharing associates in an effort to alleviate growing employee concerns over job security and the

possibility of lost welfare benefits.  These employee concerns emanated from the company's announced relocation of its home from New York to Texas and from the vigorous acquisition activity that was occurring at that time in the retail merchandise industry.  The Plan addressed these concerns by providing a lump-sum severance payment if an eligible employee was terminated within two years of a change of control.[1]  The amount of the severance payment was to be based on the employee's length of service.  Prior to the Plan's inception, Lettrich was a profit-sharing associate.  After establishing the Plan, J.C. Penney circulated news of the Plan to eligible employees, including Lettrich, along with a descriptive brochure.

In January 1991, three years after the establishment of the Plan, the Thrift Drug Division of J.C. Penney was detached and became a wholly-owned subsidiary of J.C. Penney.  The assets of the Thrift Drug Division became the assets of the new Thrift Drug, Inc. subsidiary, and the J.C. Penney employees became Thrift Drug, Inc. employees.  In November 1992, less than five years after the Plan was created, the J.C. Penney Board of Directors terminated the Plan.  Notification to participants of this change in benefits came by way of two paragraphs on page 30 of J.C. Penney's 61-page notice of shareholders meeting and proxy statement ("Proxy Statement"), which was distributed to all shareholders of record, including Lettrich, in April 1993.  In 1996, J.C. Penney purchased Eckerd Drugs and merged Thrift Drug, Inc. into the new wholly owned subsidiary.

---

[1] A "change of control" was defined to include a merger or consolidation, whether friendly or hostile.

Following that merger, all Thrift Drug stores, including the one Lettrich managed, were closed and reopened as Eckerd stores.

In 1997, Lettrich was notified of a significant decrease in his pay and bonuses. Upon receiving this notification, Lettrich attempted to avail himself of the Plan. J.C. Penney denied Lettrich's request for benefits, stating that the Plan had ended as to Thrift Drug associates in January 1991 when the Thrift Drug Division of J.C. Penney was spun off into a wholly owned subsidiary and that the Plan had been terminated altogether in 1993.

In 1998, Lettrich filed suit against J.C. Penney in the United States District Court for the Western District of Pennsylvania pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), on behalf of himself and others similarly situated. He contended that J.C. Penney's attempt to notify participants of the termination of the Plan failed to satisfy ERISA's notice and disclosure requirements set forth in 29 U.S.C. § 1024(b)(1)(B) and 29 C.F.R. § 2520.104b-1(b)(1). He also contended that his benefits under the Plan were vested and therefore survived the termination of the plan.

The Magistrate Judge to whom the case was referred for pretrial proceedings in Lettrich I noted: "It is not surprising that [Lettrich] was not aware of the termination of the separation allowance program since the notice of termination was 'buried' in the notice of the annual meeting." Amended Report and Recommendation (Nov. 24, 1998) at 10. However, relying on this Court's decision in Ackerman v. Warnaco, Inc., 55 F.3d 117 (3d Cir. 1995), the Magistrate Judge recommended that J.C. Penney's motion for

-4-

summary judgment be granted.[2]  Amended Report and Recommendation (Nov. 24, 1998) at 10 ("[D]efects in notice do not entitle an employee to receive the benefits unless the employee can show extraordinary circumstances such as bad faith by his employer or active concealment of a change in the benefits plan.").

The District Court adopted the Magistrate Judge's Amended Report and Recommendation as the opinion of the court.  Accordingly, the District Court held that the disclosure in the Proxy Statement J.C. Penney sent to Lettrich was legally sufficient notice of the Plan's termination.  After the District Court granted summary judgment in favor of J.C. Penney, Lettrich appealed to this Court.  See Lettrich v. J.C. Penney Co. Inc., 213 F.3d 765 (3d Cir. 2000) ("Lettrich I").

Specifically at issue in the 2000 appeal was ERISA's requirement that an employer notify participants of a material change in a welfare plan.  In Lettrich I, we construed 29 C.F.R. § 2520.104b-1(b)(1), the regulation that focuses on the need to take measures reasonably calculated to ensure receipt of notice, to contemplate that in some situations mailing may not be enough if it is not reasonably calculated to alert the recipients to the

_____

[2] Other Circuits have suggested that notwithstanding the general rule that plan amendments are valid in spite of inadequate notice, participants may recover the benefits that were available under the plan before the amendment if they can  make a showing of "bad faith, active concealment, or detrimental reliance," see Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 569 (7th Cir.1995), or can  "show active concealment of the amendment . . . or some significant reliance upon, or possible prejudice flowing from the lack of notice," see Godwin v. Sun Life Assur. Co. of Canada, 980 F.2d 323, 328 (5th Cir.1992) (internal quotations omitted), or demonstrate cognizable prejudice from the company's failure to fully comply with ERISA's disclosure requirements, see Veilleux v. Atochem North Am., Inc., 929 F.2d 74, 76 (2d Cir.1991) (per curiam).

significance of the mailing.  See 29 U.S.C. § 1022.  We did not decide whether that was the case here.  Rather, we held that a fact finder could conclude that a two- or three-paragraph notice of termination of a welfare benefit which was "buried" in the middle of a 61-page Proxy Statement, with nothing on the exterior to call this notice to the attention of the participants, did not satisfy the requirement.[3]  Accordingly, we remanded the case, and the case proceeded to trial.  Lettrich I, 213 F.3d at 777.

## II.

During the trial, the District Court excluded from evidence Lettrich's interpretation of the Plan's provisions relating to "successor in interest," "vested rights," and "merger or consolidation," as well as his interpretation of the Proxy Statement, because Lettrich had not read the plan's terms before the plan was terminated.  The District Court denied certification of a class, and at the conclusion of the bench trial entered judgment in favor of J.C. Penney.  The District Court did not abuse its discretion in ruling that under FRE 602, Lettrich lacked personal knowledge for his interpretation of the Plan.  Furthermore, any error was harmless because the District Court allowed Lettrich's counsel to develop his theory of the proper interpretation.

## III.

_____

[3] In Lettrich I, we did not suggest that the circumstances of this case compel a finding of active concealment sufficient to void the termination of the Plan as to Lettrich. Nor did we imply that an inference of bad faith or active concealment may arise simply from a failure to comply with ERISA's reporting and disclosure requirements.  However, in light of the similarity in the circumstances here and in Ackerman, we held that Lettrich's case should not have been dismissed on summary judgment.

Lettrich asserts that he has a right to be paid benefits under the terminated Plan. The interpretation and construction of an *unambiguous* ERISA plan is a conclusion of law, subject to *de novo* review when the "plan administrator" has a financial interest in the outcome. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 382-83 (3d Cir. 2000). The determination of whether a term is ambiguous is also a question of law. Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994). However, where a plan is found to be *ambiguous*, ascertaining its meaning requires examining many factors, which may include considering how the plan was understood by its beneficiaries, and the interpretation of ambiguous plan provisions is a question of fact. Smith v. Hartford Ins. Group, 6 F.3d 131, 135-36 (3d Cir. 1993). Contract principles dictate that review of the conflicted benefits denial should be *de novo*, giving no deference to the interpretation of either J.C. Penney or Lettrich. This Court applies "principles governing construction of contracts between parties bargaining at arms length." Pinto, 214 F.3d at 382-83.

We exercise plenary review over the District Court's conclusions of law. Epstein Family Parntership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir. 1994). We review findings of fact for clear error, giving deference to the District Court's credibility determinations. Goldstein v. Johnson & Johnson, 251 F.3d 433, 441, 445 (3d Cir. 2001).

Denial of class certification is reviewed for abuse of discretion. Fotta v. Trustees of the United Mine Workers of America, 319 F.3d 612, 616 (3d Cir. 2003); La Salle Nat'l Bank v. First Connecticut Holding Group, 287 F.3d 279, 288 (3d Cir. 2002) ("[A]buse of

discretion occurs when the court bases its opinion on a clearly erroneous finding of fact, an erroneous legal conclusion, or an improper application of law to fact.").

Lettrich cites Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1284 (7th Cir. 1977), for the proposition that a "critical view" of challenged findings of fact and conclusions of law is appropriate in this case, because the District Court adopted many of J.C. Penney's suggested findings and conclusions.[4] In addition to the fact that this Court has never adopted the Seventh Circuit's approach, Lettrich's argument is inapposite here. At the conclusion of trial, the District Court directed both parties to submit proposed findings of fact and conclusions of law, directing the attention of both sides to issues that concerned the court while inviting them to address other issues they deemed appropriate. Lettrich and J.C. Penney each proposed 152 findings and conclusions. After close to two months of deliberation, the District Court issued 124 findings of fact and 120 conclusions of law. Many were adopted from Lettrich's suggestions, many were adopted from J.C. Penney's suggestions, and many were entirely original. Therefore, the facts of this case do not militate in favor of considering the heightened standard of review articulated by the Seventh Circuit in Flowers.

---

[4] In Flowers, the District Court ruled in favor of the defendant from the bench, directed defense counsel to draft appropriate findings and conclusions, and then adopted defense counsel's draft verbatim. Here, the District Court's findings of fact and conclusions of law were not merely the product of one party's independent research and briefing after a trial on the merits. On the contrary, both parties had previously filed extensive summary judgment briefs, pre-trial memoranda, and pre-trial proposed conclusions of fact and law.

## IV.

## A.

## 1.

ERISA covers both employee welfare benefit plans and employee pension benefit plans, <u>Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.</u>, 520 U.S. 510, 514 (1997), but ERISA specifically exempts employee welfare benefit plans from its stringent vesting requirements. <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 79-81 (1995).

Lettrich's argument that he is entitled to payments because he has "vested rights" misconstrues the benefit J.C. Penney conferred. Under ERISA, "vested right" is a term of art. The provisions governing welfare benefit plans, unlike those governing pension plans, <u>see</u> 29 U.S.C. §§ 1051-1061, do not provide for the automatic vesting of welfare benefit rights. This Court has recognized that ERISA does not require welfare plan benefits to vest.[5] <u>International Union, United Auto., Aerospace & Agr. Implement Workers of America, U.A.W. v. Skinner Engine Co.</u>, 188 F.3d 130, 137-38 (3d Cir. 1999)

---

[5] Other courts agree. <u>See, e.g.</u>, <u>Hughes v. 3M Retiree Medical Plan</u>, 134 F. Supp. 2d 1062, 1070-71 (D. Minn. 2001) (citing <u>Int'l Union, UAW v. Skinner Engine Co.</u>, 188 F.3d 130, 139 (3d Cir.1999)); <u>Hutchins v. Champion Intern. Corp.</u>, 110 F.3d 1341 (8th Cir. 1997) (welfare benefits did not vest under terms of ERISA benefits plan, where plan specifically provided employer with authority to terminate or modify it). <u>Vasseur v. Halliburton Co.</u>, 950 F.2d 1002, 1006 (5th Cir. 1992) (citing <u>McGann v. H & H Music Co.</u>, 946 F.2d 401, 405 (5th Cir.1991). <u>See also</u> <u>Alday v. Container Corp. of Am.</u>, 906 F.2d 660, 663 (11th Cir.1990), <u>cert. denied</u>, 498 U.S. 1026 (1991); <u>Musto v. American Gen. Corp.</u>, 861 F.2d 897, 901 (6th Cir.1988), <u>cert. denied</u>, 490 U.S. 1020 (1989); <u>and</u> <u>Moore v. Metropolitan Life Ins. Co.</u>, 856 F.2d 488, 492 (2d Cir. 1988)).

("Although ERISA contains elaborate vesting requirements for pension plans, it does not require automatic vesting of welfare benefit plans."). Here, the parties agree that J.C. Penney's Separation Allowance Program was a welfare benefits plan.

Because vesting welfare benefits under an ERISA plan constitutes an extra ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in *clear and express language*. Id. at 137 (emphasis added); see also Hutchins v. Champion Intern. Corp., 110 F.3d 1341, 1345 (8th Cir. 1997) (A participant's disability benefits do not vest under the terms of an ERISA benefits plan, where the plan specifically provided the employer with the authority to terminate or modify it.). In the absence of a vested rights provision, an employer is free to terminate a welfare benefit plan at any time. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 79-81 (1995); Becker v. Mack Trucks, Inc., 281 F.3d 372, 379 (3d Cir. 2002), cert. denied, 537 U.S. 818 (2002); International Ass'n of Machinists and Aerospace Workers, Woodworkers Div., AFL-CIO v. Masonite Corp., 122 F.3d 228, 234 n. 4 (5th Cir. 1997) (Because vesting is not mandatory for employee welfare benefit plans, an employer may unilaterally modify or terminate employee welfare benefits absent the employer's contractual agreement to the contrary.); John Morrell & Co. v. United Food & Commercial Workers Int'l Union, 37 F.3d 1302, 1308 (8th Cir. 1994) (same).

The drafting of J.C. Penney's Separation Allowance Program indicates an appreciation of the fact that welfare benefits would not vest automatically. Immediately preceding the enumeration of employee benefits, J.C. Penney reserved the right to

terminate the plan, a legitimate right under ERISA. Accordingly, the District Court's finding that Lettrich did not have vested rights under the Plan supports its judgment in favor of J.C. Penney.

It is true that the Plan uses the term "vested rights," but even a cursory contextual analysis of J.C. Penney's plan document discloses that J.C. Penney did not intend to confer unalterable and irrevocable rights on its employees. This is evident because the plan document, before J.C. Penney addressed any employee rights, reserved its right as the employer to terminate the Plan altogether.

As an employer, J.C. Penney conferred on its employees welfare benefits that would mature unless the employer amended or terminated the Plan. These benefits were to mature when: (i) an employee was eligible for bonuses (i.e., higher level management employees) and (ii) that employee lost his or her job, status or salary within two years of a "Change of Control" of J.C. Penney. Once an employee's benefits matured, the employee had specific rights. These rights enabled a profit-sharing management employee, such as Lettrich, who had accumulated nine months of tenure: (i) to prevent J.C. Penney from terminating the Plan, *except upon its five-year anniversary*; (ii) to prevent J.C. Penney from amending the Plan to reduce benefits, except upon the written approval of all participants; (iii) to enforce the Plan against J.C. Penney or any successor in interest, in the event of a change of control within the five-year term of the Plan; and (iv) to be paid benefits under the Plan in the event of a termination of employment within two years after a change in control.

-11-

Lettrich relies heavily upon Section 16 of the Plan, which indicates that the Plan intended to "confer vested rights on each Participant."[6] However, were this Court to interpret that language to confer absolute rights, as Lettrich argues it should, we would have to ignore Section 15 of the Plan,[7] which entitles J.C. Penney to terminate the Plan on its five-year anniversary. J.C. Penney's explicit retention of the ability to terminate the plan evidences its intent not to confer unalterable or interminable rights. Becker v. Mack

---

[6] In full, Section 16 of the Plan states:

> Participant Rights ¶ The Company and Subsidiary intend ths Program to constitute a legally enforceable obligation between (a) the Company or Subsidiary (as appropriate) and (b) each Participant, and to be subject to enforcement under Section 502(a) of ERISA. It is also intended that the Program confer vested rights on each Participant under the terms of the Program with each Participants being third party beneficiaries. Nothing in the Program, however, shall be construed to confer on any Participant any right to continue in the employ of the Company or a Subsidiary or affect in any way the right of the Company or Subsidiary or affect in any way the right of the Company or Subsidiary to terminate a Participant's employment without prior notice at any time for any reason or no reason. A178.

[7] In full, Section 15 of the Plan states:

> Termination ¶ The Program shall continue for a term of five years from the Effective Date, provided, however, that it shall be renewed automatically for subsequent five year periods unless the Board of Directors of the Company or Subsidiary (as appropriate) shall decide to terminate the Program by duly adopting a resolution stating that it shall not be renewed. Such resolution shall be adopted at least sixty days before the end of any of the above five year periods. If, however, a Change of Control occurs during the term of the Program, it shall continue until the Company or Subsidiary (as appropriate) shall have fully performed all of its obligations under the Program with respect to all Participants. A178.

-12-

Trucks, Inc., 281 F.3d 372, 379 (3d Cir. 2002), cert. denied, 537 U.S. 818 (2002). See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 79-81 (1995). J.C. Penney exercised its prerogative under Section 15 of the Plan, terminating it prior to its five-year anniversary. Notwithstanding the language Lettrich highlights in the Plan, referring to "vested rights," J.C. Penney did not confer rights that were absolute, irrevocable, or unalterable.

To the extent that an ERISA plan document is unambiguous, oral statements and other extrinsic evidence may not be introduced to modify its meaning. See In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896, 902 (3d Cir. 1995); see also Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 522 (3d Cir. 1999) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") (citation omitted); International Union, United Auto., Aerospace & Agr. Implement Workers of America, U.A.W. v. Skinner Engine Co., 188 F.3d 130, 139 (3d Cir. 1999) ("[C]ourts are reluctant to read more benefits into an ERISA plan than its plain language confers.") (citation omitted). Documents like the Plan must be interpreted so as to give effect to the entirety of their provisions, rather than by selectively excising certain words and phrases to imbue them with meaning. See Atlantic Mut. Ins. Co. v. Brotech Corp., 857 F.Supp. 423, 427 (E.D. Pa. 1994), aff'd, 60 F.3d 813 (3d Cir. 1995); Filiatrault v. Comverse Technology, Inc., 275 F.3d 131, 138 (1st Cir. 2001). Interpretation of the entirety of the Plan's provisions supports the District Court's conclusion that Lettrich did

-13-

not have vested rights under the Plan.[8]

## 2.

Any employee benefit plan to which ERISA applies "is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982) (cited by Henglein v. Informal Plan for Plant Shutdown Ben. for Salaried Employees, 974 F.2d 391, 396 (3d Cir. 1992)). As stated above, ERISA recognizes two types of employee benefit plans, pension plans and welfare benefit plans,[9] and delineates different requirements for each.

## 3.

ERISA requires every plan to be "established and maintained pursuant to a written

---

[8] In passing, we note an additional argument by Lettrich respecting interpretation of a key phrase in the Plan. Lettrich insists that he should have been allowed to testify about his personal understanding of the term "successor in interest," as well as on other relevant terms in the Plan. However, the District Court correctly barred such testimony as irrelevant. As Lettrich concedes, he did not even see the Plan until after he filed suit, so his understanding of "successor in interest" could have no relevant bearing on the parties' intended meaning of that term. Moreover, Lettrich's interpretations of the various terms were undoubtedly represented to the District Court by counsel, so there was no prejudice in excluding his testimony.

[9] 29 U.S.C. § 1002(1); 29 C.F.R. § 2510.3-1(a)(2) ("only plans which provide benefits described in section 3(1)(A) of [ERISA] or in section 302(c) of the Labor Management Relations Act of 1947 . . . (other than pensions on retirement or death) constitute welfare plans"); see In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896, 901 (3d Cir.1995) ("Unisys II"). Unlike pension plans, welfare benefit plans are not subject to the full scope of ERISA's requirements. 29 U.S.C. §§ 1051(1) 1081(a)(1).

-14-

instrument," the contents of which are statutorily specified. 29 U.S.C. § 1102(a)(1). Any

change or modification to a welfare plan must be in writing. Id.; Bill Gray Enters. v.

Gourley, 248 F.3d 206, 220 (3d Cir. 2001) (holding that failure to recognize the

unambiguous written provisions of a plan as controlling negates the effectiveness of any

modification) (citation omitted). Plan administrators must furnish participants with a

summary of any material modifications written in a manner calculated to be understood

by the average participant. See 29 U.S.C. § 1022(a). ERISA characterizes all persons

having authority over or responsibility for the plan as fiduciaries, and it imposes upon

these fiduciaries both reporting and disclosure obligations, as well as prescriptions for

their conduct of plan business. See 29 U.S.C. §§ 1002(21)(A), 1021, 1101-1114.

Additionally, a welfare benefits plan must include an amendment procedure.[10] 29

---

[10] The Supreme Court emphasized the importance of amendment procedures in Curtiss-Wright Corp. v. Schoonejongen. 514 U.S. 73 (1995). In Curtiss-Wright, the Supreme Court held that an employer must follow the amendment procedure set out in its benefit plan, and the Court remanded for a determination whether there was compliance with that amendment procedure. 514 U.S. at 78 (1995).

A few months after the Supreme Court's decision in Curtiss-Wright, this Court rejected an employer's contention that the amendment procedures of ERISA are inapplicable to the complete rescission of a benefit plan. Ackerman v. Warnaco, Inc., 55 F.3d 117, 125 (3d Cir. 1995) (If a plan administrator actively conceals a material change in welfare benefits from an employee, and the employee relies to his or her detriment on that omission by the administrator, the change is invalid as to that employee.). In Ackerman, this Court emphasized that "the requirements of section 402(b)(3) apply to plan terminations as well as plan amendments," reasoning that "it is anomalous to suggest that ERISA offers employees protection from mere changes in employee benefit plans, but does not afford protection against wholesale elimination of benefits." Id., at 121; see also Deibler v. United Food & Commercial Workers' Local Union 23, 973 F.2d 206, 210 (3d Cir. 1992).

U.S.C.A. § 1102(b)(3); <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73 (1995); <u>Ackerman v. Warnaco, Inc.</u>, 55 F.3d 117, 125 (3d Cir. 1995). The District Court in <u>Ackerman</u>, like the District Court in <u>Lettrich I</u>, entered summary judgment for the employer after emphasizing that a procedural defect in notice does not give rise to a substantive remedy and after finding no extraordinary circumstances to warrant deviating from the general rule requiring notice.[11] On appeal, we acknowledged the validity of this general rule, but stated that nonetheless there are situations, usually presenting extraordinary circumstances, where the remedy of striking a plan amendment may be available.[12] <u>Ackerman</u>, 55 F.3d at 125 n. 8. The two such situations delineated in <u>Ackerman</u> were (i) "where the employer has acted in bad faith" or (ii) "where the employer has actively concealed a change in a benefit plan, and the covered employees have been substantially harmed by virtue of the employer's actions." <u>Id.</u>, at 125. No

---

[11] In reversing the grant of summary judgment in <u>Ackerman</u>, this Court focused on the active concealment exception, noting: (i) the complete failure to provide the handbook to the employees; (ii) the failure to hold scheduled meetings; (iii) the issuance of a potentially misleading letter to the employees concerning "changes" to the severance program rather than the termination of the program; and (iv) the hostile employment climate. <u>Ackerman v. Warnaco, Inc.</u>, 55 F.3d 117, 123-25 (3d Cir. 1995).

[12] In <u>Ackerman</u>, we stated: "While we do not rule out the possibility that administrative error accounted for [the employer's] omissions, we conclude that a reasonable fact finder could infer from these facts and from the plaintiffs' evidence regarding the employment climate at the Altoona plant that Warnaco actively concealed the change to its severance policy in order to prevent employees at the Altoona plant from leaving." <u>Id.</u> Additionally, in <u>Hozier v. Midwest Fasteners, Inc.</u>, we "implicitly recognized the possibility of striking down a plan amendment where there has been a reporting and disclosure violation concerning the amendment." <u>Id.</u>, at 125, n. 8 (citing <u>Hozier v. Midwest Fasteners, Inc.</u>, 908 F.2d 1155, 1168-69 n. 15 (3d Cir. 1990)).

-16-

facts to indicate either bad faith or active concealment support reversal of the District

Court's judgment in favor of J.C. Penney.  In fact, J.C. Penney provided actual notice of

the Plan's termination in its 1993 Proxy Statement.[13]

**4.**

Lettrich asserts that, as a fiduciary, J.C. Penney can never be permitted to

terminate the Plan because doing so would be contrary to the interests of the Plan's

beneficiaries.[14]  However,

> [w]hen an employer makes decisions about the design of a welfare plan, such
> as a severance plan, it functions as an employer and not as an administrator
> and thus is not acting as a fiduciary.  Accordingly, an employer can create a
> plan that furthers its business interests, and it can act according to these
> interests in amending or terminating the plan.

Noorily v. Betts Corp., 188 F.3d 153, 158 (3d Cir. 1999), cert. denied, 529 U.S. 1053

(2000) (citations omitted).  It is only when an employer is acting as an administrator of

the plan, by paying benefits or investing plan funds, that the employer is a fiduciary who

must act in the interest of the plan's participants.  Noorily, 188 F.3d at 158.  In that

---

[13] The actual notice provided by J.C. Penney similarly nullifies Lettrich's equitable estoppel argument, since equitable estoppel requires a showing of material misrepresentation and fraud.  Skinner Engine, 188 F.3d at 151-52.

[14] The Supreme Court has held that an employer acted as a "fiduciary" when it significantly and deliberately misled plan beneficiaries.  Varity Corp. v. Howe, 516 U.S. 489, 498-99 (1996).  Varity held that Section 502(a)(3) of ERISA authorizes lawsuits for individual equitable relief for breach of fiduciary obligations.  This type of fiduciary breach may also result in class-wide relief.  However, such analysis is not on point where, as here, there is no fiduciary relationship to speak of and there was no deliberate misrepresentation.

instance, the employer's actions are evaluated under the law of trusts. J.C. Penney neither paid benefits nor invested plan funds.

Key to this analysis is the fact that J.C. Penney was acting in its own business interest in implementing the plan. The Plan was adopted to address profit-sharing employee concerns about job security prompted by merger and acquisition activity in the retail industry and the relocation of J.C. Penney's headquarters from New York to Texas. It was intended to retain valued employees and promote their productivity by providing severance benefits to ease the concerns of managers who might lose income or stature as a result of a merger. The Plan was not intended to pay benefits to employees who lost their jobs because J.C. Penney sold the division the employees worked for, or because J.C. Penney elected to engage in a massive reduction in force. Furthermore, at its inception, adoption of the Plan was not motivated by J.C. Penney's desire to retain Thrift Drug Division employees. In short, J.C. Penney's business purpose in implementing the Plan was to ensure productivity and loyalty among key employees by assuring them that the company was loyal to them.

**B.**

On remand, Lettrich sought certification of a class, pursuant to FED. R. CIV. PROC. 23.[15] The District Court referred the case to a Magistrate Judge for pretrial proceedings

---

[15] Lettrich was required to establish the following requirements: (i) the class is so *numerous* that joinder of all members is impracticable; (ii) there are questions of law or fact *common* to the class; (iii) the claims or defenses of Lettrich are *typical* of the claims or defenses of the class; and (iv) Lettrich would fairly and adequately protect the interests

-18-

and adopted the Report and Recommendation of the Magistrate, denying class certification.

**1.**

Lettrich had not clearly identified the class he sought to represent. The Plan provided benefits only for full-time, bonus eligible employees and only for employees who terminated their employment within two years after a change of control. Additionally, the Plan did not provide benefits for employees who retired during that two-year period or for employees who would have passed away during that two-year period. Finally, the numbers included in Lettrich's class would be further reduced by the need of the class members to establish that they relied on the notice of the Plan to their detriment, that they were constructively discharged, and that they were eligible for bonuses.

**2.**

Lettrich failed to identify questions of law or fact common to a class. Lettrich's proposed class included two different groups. Lettrich's individual claim was that the termination of the Plan in 1993 was ineffective as to him because he was not given notice of the termination and he relied to his detriment on the existence of the Plan by not

---

of the class. Lettrich attempted to certify the class under FED. R. CIV. PROC. 23(b)(3), which dictates that "the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy.

-19-

leaving Thrift to accept other offers. However, because many of the members of the proposed class were never told about the Plan, they could not have relied on its existence to their detriment. Lettrich therefore identified a second group within the class - employees who were not told about the existence of the class and who therefore did not rely on it to their detriment. Lettrich's two separate groups presented different questions of law and fact and would have required different jury instructions for each group.

**3.**

Lettrich admitted that his claims were not identical to those of individuals who were harmed by a pattern of concealment, arguing only that "they could be made typical." In addition to not clearly identifying the class, Lettrich had not identified how he could adequately represent class members who had claims that were factually and legally different from his.

**4.**

Finally, it was altogether possible that as to each of the two different groups Lettrich attempted to identify,[16] there might be *some* common questions of law or fact. However, the limited record did not indicate that such issues would predominate over the individual issues, such as each member's reliance on the notice. Because of the District Court's recognition of the difficulties in certifying Lettrich's proposed class and subclass, it did not abuse its discretion in denying class certification.

---

[16] One group consisted of claimants who received notice of the Plan. The other group consisted of claimants who did not receive notice of the Plan.

## V.

For the reasons explained above, we affirm the judgment of the District Court. We have considered all of the appellant's remaining arguments and find no ground for reversal.